The State of Ohio, Appellee, *v.* Watson, Appellant.

[Cite as *State v. Watson* (1991), 61 Ohio St.3d 1.]

(No. 89–1079—Submitted March 6, 1991—Decided June 19, 1991.)

*John F. Holcomb,* prosecuting attorney, *Robert N. Piper III* and *Daniel G. Eichel,* for appellee.

*Randall M. Dana,* Public Defender, and *Jane P. Perry,* for appellant.

HERBERT R. BROWN, J.  R.C. 2929.05(A) requires us to undertake a three-part review in a capital case.  First, we review the judgment and consider Watson's twenty-one propositions of law, in which he asserts various errors by the trial and appellate courts.  Second, we determine the appropriateness of the death sentence in this case by independently weighing the evidence and determining whether the aggravating circumstances outweigh the mitigating factors.  Finally, we must determine whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases.  For the reasons which follow we affirm the appellant's conviction, but vacate the death sentence and remand for imposition of a life sentence pursuant to R.C. 2929.06 and *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744.

I

Trial Errors

We first consider appellant's asserted legal errors at trial.  The principal issues include the prosecution's use of improper impeachment evidence, inflammatory autopsy photographs, prosecutorial misconduct, and insufficiency of evidence to sustain a conviction.

A

Improper Prosecution Evidence

*Impeachment By Extrinsic Evidence*

In his first proposition of law, Watson argues that the state improperly impeached two defense witnesses, Parker and Jones, by using extrinsic evidence of prior inconsistent statements.  Watson maintains that Detective Gross improperly testified, during the state's case in chief, that when he showed Parker and Jones a twelve-photograph array including photos of both Watson and Henderson, neither Parker nor Jones was able to identify either

of the men. This evidence impeached Parker and Jones because both had claimed they would be able to identify Watson after having seen him at a preliminary hearing. Furthermore, Parker and Jones had both seen a photo of Henderson before trial and had seen Watson at the preliminary hearing and on television.

Watson argues that the prosecution's impeachment evidence was improper under Evid.R. 613(B), which states: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny [the statement] * * *."

Ordinarily, the prosecutor's use of impeachment prior to testimony by defense witnesses would be error. However, because Watson did not object to Detective Gross's testimony at trial, the plain error rule applies. Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. Plain error does not exist unless, but for the error, the outcome at trial would have been different. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899.

We find no merit in Watson's assertions of plain error. At the time of Detective Gross's impeachment testimony, Watson had already introduced prior hearsay statements by Parker and Jones that Watson was not the robber. This occurred during recross-examination of another state witness, Detective Joe Logsdon. In response to Logsdon's testimony that he had found no evidence inconsistent with the eyewitness identification of Toney, Moon, and Prater, defense counsel asked Logsdon several questions, one over the state's objections, about Parker's and Jones's assertions that Watson was not the robber.

Evid.R. 806 provides that when a hearsay statement is admitted into evidence "the credibility of the declarant may be attacked * * * by any evidence which would be admissible for those purposes if declarant had testified as a witness." Furthermore, attacking the credibility of an out-of-court declarant " * * * is not subject to any requirement that he may have been afforded an opportunity to deny or explain." Evid.R. 806. Because Watson had introduced the hearsay statements of Parker and Jones through Logsdon's testimony, it was not error for the state to impeach declarants Parker and Jones through Gross's testimony. See *State v. Heinish* (1990), 50 Ohio St.3d 231, 237, 553 N.E.2d 1026, 1033.

Watson counters with the assertion that Parker's and Jones's statements that Watson was not the robber, introduced through Logsdon's testimony, were not hearsay statements. Watson argues that these statements only

impeached Logsdon's testimony that he had found no conflicting evidence and that they were not admitted for the truth of the matter asserted. However, no limiting instructions were placed on these statements at the time they were introduced, and the jury was free to consider them for any purpose. Accordingly we find no error, plain or otherwise.

*Gruesome Photographs*

In his second proposition of law Watson argues that the prosecution improperly admitted into evidence a series of crime scene and autopsy photographs of Mast's body. Watson argues that these graphic photographs were cumulative and prejudicial and served little, if any, probative value because the cause of Mast's death was never at issue.

Prior to trial, Watson moved to suppress all photographs of Mast's body, but the trial judge deferred ruling until trial. However, when the prosecutor offered the photographs into evidence at trial, Watson failed to object. Therefore the plain error rule applies. *Moreland, supra.*

Under Evid.R. 403 and 611(A) the admission of photographs is within the trial court's discretion. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710, 726. In a capital case, nonrepetitive photographs, even if gruesome, are admissible if relevant and of probative value as long as the probative value of each photograph outweighs the danger of material prejudice to the defendant. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus.

Among the disputed photographs are photos of Mast's body taken at the crime scene from different distances or angles. The photos show different aspects of Mast's body, lying on his stomach, as well as blood and apparent brain matter strewn on the floor. These photos are not particularly gruesome, and each photo has probative value in showing how the killing took place. See *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542, 550–551. There was no error in the admission of the crime scene photographs.

There are also six autopsy photos of Mast's head taken from different distances and angles. We agree with Watson that these five are truly gruesome photographs depicting the very substantial injury that Mast suffered when his brain was literally blown out of his skull. Although one or two of these photos may have been admissible, the trial court erred by admitting all five. The manner and cause of death was never disputed at trial. Nor was any issue raised as to the killer's intention. These graphic photos were cumulative, and the potential prejudicial effect on the jury outweighed their minimal probative value.

However, even though the trial court erred in admitting the autopsy photographs into evidence, we cannot say that, but for the admission of the gruesome photos, the result of Watson's trial would have been different. Accordingly no plain error occurred and proposition two is not well-taken.

## Impeachment By Misconduct Evidence

In proposition three, Watson contends that the state improperly impeached defense witness Jones with extrinsic evidence of misconduct. After Jones testified that Watson was not the man she saw running from the store with a shotgun, the prosecutor asked her on cross-examination whether she and Parker, another defense witness, had discussed Parker's testimony. Jones admitted talking to Parker, but denied any discussion of his testimony. In rebuttal the state called Detective Gross who testified that after Parker's testimony and before Jones testified, Gross overheard Parker and Jones talking in the hallway. Gross testified that Parker said "something about Pershing Avenue and * * * that he had told them something about turning up the sidewalk."

Watson contends that this impeachment evidence violated Evid.R. 608(B), which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility * * * may not be proved by extrinsic evidence."

The state counters that Gross's testimony tended to show Jones's bias or prejudice. *State v. Kehn* (1977), 50 Ohio St.2d 11, 19, 4 O.O.3d 74, 78, 361 N.E.2d 1330, 1335. We find this argument unconvincing. There is no evidence that Jones knew Watson or had any interest in the case other than a firm conviction that Watson did not kill her friend Mast.

The state also relies on Evid.R. 615, which mandates the separation of witnesses upon a party's request. The state argues that a court can take corrective measures if a witness violates a separation order, including "permitting the transgression to reflect upon the witness's credibility." 1 Weissenberger, Ohio Evidence (1991), Section 615.3. A separation order did exist in this case, and any conversation between Parker and Jones would be a violation of that order. The record, however, does not indicate that the trial court admitted this testimony as a corrective measure for any violation of the protective order.

When the state called Detective Gross as a rebuttal witness, it was obviously trying to impeach Jones's credibility by extrinsic evidence of a specific instance of her conduct. The trial court erred by allowing this testimony into evidence as it was a violation of Evid.R. 608(B). However, because defense counsel did not object to this evidence at trial, the plain error

rule applies. The violation does not rise to the level of plain error. While witness credibility played an important role in this case, we cannot say that, absent the improper testimony, the result at trial would have been different. Therefore, we find Watson's third proposition without merit.

## B

### Prosecutorial Misconduct

#### *Prosecution Argument*

Watson argues in his fourth proposition that the prosecutor made certain comments during his guilt and penalty phase arguments which constituted prosecutorial misconduct and deprived Watson of a fair trial.

Watson first complains of comments during closing arguments at the guilt phase. He contends that the prosecutor impermissibly shifted the burden of proof and commented on Watson's failure to testify in violation of *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; see, also, *State v. Thompson* (1987), 33 Ohio St.3d 1, 4, 514 N.E.2d 407, 411. The prosecutor asserted that the "only people they [the defense] have are these alleged eye witnesses. You didn't hear from the guy who drove him up here or the guy who drove him back. You didn't hear where he was." Later the prosecutor asked, "Did you hear how he [Watson] got home that night? No, zero, zero." The prosecutor also argued in closing that the defense "indicated they're going to tell you who did it. But have you had any evidence, have you had any proof other than what we've given you[?]"

The state counters that these comments responded to defense counsel's opening statements, in which he said that "I'd like to stand here and tell you that I know who killed Eli Mast and before it's over I'm going to tell you who killed Eli Mast," and that Watson got a ride from Cincinnati to Hamilton with a "friend of his." Defense counsel also stated that the "evidence is going to prove, not that we have to prove anything, but it is going to prove beyond a reasonable doubt that Kevin Watson did not kill Eli Mast."

We conclude that the prosecutor's statements were not a comment on Watson's failure to testify. "The prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case." *Lockett v. Ohio* (1978), 438 U.S. 586, 595 [98 S.Ct. 2954, 2959, 57 L.Ed.2d 973, 983] * * *." *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 17, 490 N.E.2d 906, 911. Furthermore, the prosecutor did not use language in these comments which the jury would "naturally and necessarily" take as a comment on Watson's failure to testify. *Id.*

Watson also asserts that the prosecutor improperly speculated about how Toney would have committed the crime had she been an accomplice of Henderson. However, these comments also responded to defense counsel's speculation that Toney and Henderson staged the robbery and then shifted the blame to Watson. Some latitude is granted to both parties in closing argument. *State v. Byrd* (1987), 32 Ohio St.3d 79, 82, 512 N.E.2d 611, 616.

Watson next argues that the prosecutor expressed his personal opinion that Henderson was guilty only of that with which he had been charged: complicity to robbery. Again, these comments responded to defense counsel's repeated argument that Henderson was responsible for the murder. A prosecutor may state his opinion if it is based on the evidence presented at trial. *State v. Tyler* (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576, 595.

Finally, Watson complains that the prosecutor's remarks vouched for the credibility of two detectives who testified for the state. This argument is without merit. The prosecutor simply referred to the number of years of experience that each detective had on the police force—a factor the jury is entitled to consider in evaluating their testimony.

We need not consider the prosecutor's comments during the penalty phase as we vacate Watson's death sentence. Accordingly, Watson's fourth proposition of law is overruled.

### Peremptory Challenges

In his twelfth proposition of law, Watson argues that the prosecutor improperly used his peremptory challenges to exclude prospective jurors who held some reservations about imposing the death penalty. Once again, Watson waived this error by failing to object at trial or raise the error before the court of appeals.

Furthermore, we have rejected attempts to extend the limited principle of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Other than excluding prospective jurors based on race, a prosecutor is free to exercise his peremptory challenge for any reason. *State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419. Watson's twelfth proposition of law is without merit.

### C

### Jury View

In proposition five, Watson contends that the trial court erred in granting the jury's request to view the scene a second time, after they had already begun deliberations. Again, Watson waives all but plain error as defense

counsel did not object. In fact, the jury's request was consistent with Watson's pretrial request for a view of the scene at the close of all evidence.

We conclude that the trial court did not err in granting the jury's request. R.C. 2945.16, which authorizes a view of the premises, does not prohibit a second view. Also, the trial court has broad discretion in regard to jury views, and we will not disturb its judgment absent an abuse of discretion. *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585, 588. The site of the SOS hall, where Jones and Brockman encountered the robber, was material to the issues at trial. Moreover, the trial court fully instructed the jury that what they would see was not evidence but could be useful in helping them to better understand what was presented in court. Therefore, Watson's fifth proposition of law is not well-taken.

## D

### Sufficiency of the Evidence

In his sixth proposition of law, Watson claims that there was insufficient evidence to convict him beyond a reasonable doubt of aggravated murder and aggravated robbery.

Watson points to three deficiencies in the state's case against him. First, the evidence against Watson involves three eyewitnesses: Toney and the two teenage boys playing video games in the back of the store, Moon and Prater. However, Moon and Prater saw the robber for only seconds before they ran into a back room and shut the door, fearing for their safety. Their vague descriptions reflect the brief and distant view they had of the robber. They described the robber as having slight facial hair, wearing no hat, and having braided hair. One of the teenagers said the robber wore a grey sweater or jacket.

The descriptions given by the boys conflict with Toney's description of the robber. She described the robber as having a full beard and wearing a ball cap and a white T-shirt. Although Toney had a better opportunity to view and identify the robber, her credibility suffers because she initially lied to the police when she denied knowing the robber. Toney also had an interest in protecting her stepbrother Henderson, and she had financial difficulties herself.

The second problem in the state's case is that four disinterested witnesses (some of whom were friends of the victim) testified for the defense that Watson was not the man they saw running from Mast's store with a shotgun. The defense witnesses gave descriptions of the robber that were consistent

with each other, even though their descriptions did not match the descriptions given by either Toney or the two boys.

The third deficiency in the state's case was that no physical evidence linked Watson to the crime. In fact, the circumstantial evidence points to Henderson. The evidence indicates that Henderson stole the shotgun from Cook and loaded it. Henderson's fingerprints were found on the live shotgun shell recovered from Mast's store. Henderson told police that he threw the shotgun in the river and disposed of the gym bag. The police found the shotgun in the river where Henderson said he threw it.

When reviewing for sufficiency of the evidence to sustain a conviction, we must consider the evidence in a light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 577; *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 930. The evaluation of the evidence and the credibility of the witnesses is in the province of the jury and we may not reverse a conviction where the record shows a verdict is based on sufficient evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, syllabus.

Despite problems with the state's case against him, we find sufficient evidence to sustain Watson's conviction. If believed by the jury, Toney's testimony combined with the other evidence is sufficient to convict Watson beyond a reasonable doubt. Toney had an excellent opportunity to identify the robber and eventually did so. She was close by, saw him face to face, and had seen him several times before. Furthermore, two independent eye-witnesses, Moon and Prater, also identified Watson as the robber. Accordingly, we overrule Watson's sixth proposition of law.

E

Effective Assistance of Counsel

In proposition ten, Watson asserts that his counsel did not effectively assist him in the voir dire, guilt, and penalty phases of his trial. He asserts a denial of his federal and state constitutional rights to counsel.

In *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, the United States Supreme Court set forth the standard for reversing a defendant's conviction based on ineffective assistance of counsel. The two-prong test requires a showing that (1) counsel's performance was so deficient that he was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) counsel's errors prejudiced the defendant and deprived him of a trial whose result was reliable. *Id.* To warrant reversal, "[t]he defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

With respect to voir dire, Watson claims that, because his case involved a white victim and a black defendant, counsel's failure to question prospective jurors on possible racial prejudice was prejudicial. We do not agree. Watson's counsel fought the case on the robber's identity, not on racial confrontation. Therefore, defense counsel could have properly decided that questions about racial prejudice were unwise. Furthermore, his reliance on *Turner v. Murray* (1986), 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27, is misplaced. The *Turner* court stated that the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel. *Id.* at 37, 106 S.Ct. at 1688, 90 L.Ed.2d at 37, and fn. 10.

Watson further claims that he was prejudiced because his counsel failed to adequately question about reasonable doubt, presumption of innocence, and the defendant's right not to testify. These claims also lack merit because the court or opposing counsel covered reasonable doubt and burden of proof in the group voir dire which preceded the individual voir dire. He need not repeat questions about topics already covered by group voir dire, opposing counsel, or the judge.

With respect to the guilt phase of his trial, Watson contends that counsel's omissions and failures to object to prejudicial evidence constituted ineffective assistance of counsel. We disagree. Watson has not shown a reasonable probability that but for counsel's failure to object to Detective Gross's impeachment testimony or the gruesome photos the result of his trial would have been different. *Strickland, supra,* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. See our discussion in Part IA, *supra.* Additionally, defense counsel's decision not to object to the prosecutor's closing argument or to the jury's request for a second view of the scene was clearly within the range of professional judgment. See our discussion in Parts IB and IC, *supra.*

Finally, Watson argues that his counsel elicited prejudicial admissions that Watson allegedly made to Henderson. During cross-examination, defense counsel asked Detective Logsdon why Henderson threw the shotgun in the river. Logsdon answered that "he was told by Kevin Watson that he blew the man away * * *." This otherwise inadmissible double hearsay, which Watson's own counsel placed into evidence, was harmful. However, the cross-examination as a whole fit the defense strategy of linking Henderson to the crime and suggesting that he killed Mast. Thus, the cross-examination was a tactical choice and not a deficient performance under the *Strickland* test.

Because we vacate Watson's death sentence we need not address Watson's claim that he was ineffectively represented during the penalty phase. Accordingly, Watson's tenth proposition is overruled.

F

In propositions of law seven, eight, nine, sixteen and eighteen, Watson asserts various errors at the penalty phase of his trial. Because we vacate his death sentence as a result of our independent review pursuant to R.C. 2929.05(A), we need not address those asserted errors.

G

We conclude, after reviewing Watson's asserted errors at trial, that Watson was properly convicted of the aggravated murder, aggravated robbery, and the gun specification.

II

Appellate Review

A

Unrecorded Jury View

In proposition thirteen, Watson argues that the trial court's failure to record the two jury views of the scene constituted prejudicial error.

Crim.R. 22 requires that in "serious offense cases all proceedings shall be recorded." Additionally, in capital cases, R.C. 2929.03(G) requires that "the entire record" be transmitted for appellate review. We have recognized the importance of a complete record in a capital case. *State, ex rel. Spirko, v. Court of Appeals* (1986), 27 Ohio St.3d 13, 27 OBR 432, 501 N.E.2d 625.

Watson, however, did not request a record of the jury views at trial and did not raise the issue in the court of appeals. Furthermore, he has not supplemented the record, pursuant to App.R. 9(C) or 9(E), in an effort to show prejudice. In the absence of such an effort, we cannot presume prejudice. *State v. Tyler* (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576, 596; *State v. Brewer* (1990), 48 Ohio St.3d 50, 61, 549 N.E.2d 491, 502. Watson's thirteenth proposition of law is therefore overruled.

B

Lack of Adequate Intermediate Appellate Review

Watson contends in proposition fourteen that the appellate review was constitutionally inadequate because portions of the record were missing. He

points to missing transcripts for (1) voir dire, (2) penalty phase arguments, (3) preliminary hearing, (4) hearing on pretrial motions of September 29, 1987, (5) Toney's pretrial statements, and (6) jury views.

We previously granted Watson's motion to supplement the record, but denied his motion to remand this case to the court of appeals. *State v. Watson* (1989), 46 Ohio St.3d 716, 546 N.E.2d 1333. Thereafter, Watson filed items (1) through (5) with this court.

R.C. 2929.05 entitles Watson to a meaningful intermediate appellate review. *State, ex rel. Spirko, v. Court of Appeals, supra.* However, the absence of transcripts for items (1) through (6) did not deny Watson a meaningful review in the appellate court.

With respect to the missing voir dire transcript (1), Watson's complaints about the prosecution's peremptory challenges and an inadequate voir dire are without merit. See our discussion in Parts IB and IE, *supra.* Watson has raised no other complaints about the jury selection process here.

The lack of a transcript of arguments at the penalty phase (2) caused no prejudice, since we vacate the death penalty.

The lack of transcripts for the preliminary (3) and motion hearings (4) did not prejudice Watson before the court of appeals because Watson alleged no errors with respect to these hearings. Likewise, Watson has not alleged before this court any error relating to Toney's pretrial statements (5) and has thereby abandoned that issue and any claim of prejudice. The absence of recorded jury views (6) also has not been shown to have prejudiced Watson. See our discussion in Part IIA, *supra.*

Thus, although a capital case requires that all proceedings be recorded and transmitted on appeal, none of the missing items prejudiced Watson's rights. We cannot presume prejudice, *Brewer, supra, Tyler, supra,* and proposition fourteen is, therefore, without merit.

## C

### Effective Assistance of Appellate Counsel

In proposition fifteen Watson argues that he lacked effective assistance of appellate counsel before the court of appeals. Specifically Watson complains that his appellate counsel, the same counsel who represented him at trial, failed to ensure that a complete record of his trial was filed with the court of appeals. He also points to appellate counsel's failure to raise issues now raised before us in propositions one through five, seven, eight, twelve, sixteen and twenty.

On a criminal appeal as of right, Watson is entitled to effective assistance of appellate counsel, who must exercise reasonable professional judgment in presenting the appeal. *Evitts v. Lucey* (1985), 469 U.S. 387, 397, 105 S.Ct. 830, 836, 83 L.Ed.2d 821, 830–831. The two-part *Strickland* test applies.

However, we find this claim without merit. Our discussions of issues in Parts IA, IB, IC, IF and IIA, *supra,* and in Part III, *infra,* indicate that counsel did not perform deficiently by failing to raise these issues in the court of appeals. "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy. *Jones v. Barnes,* 463 U.S. 745, 751–752 [103 S.Ct. 3308, 3312–3313, 77 L.Ed.2d 987, 994] (1983)." *Smith v. Murray* (1986), 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434, 445. More importantly, Watson has not shown prejudice from his appellate counsel's failure to raise these issues before the court of appeals. Proposition fifteen is not well-taken.

## D

### Failure to Remand

Watson maintains in proposition of law twenty-one that this court erred when we denied his motion to remand to the court of appeals. See *State v. Watson* (1990), 50 Ohio St.3d 714, 553 N.E.2d 1365; *State v. Watson* (1989), 46 Ohio St.3d 716, 546 N.E.2d 1333. Watson asserts that his record arrived in this court in disarray. This assertion is related to issues already disposed of in propositions thirteen and fourteen, see our discussion in Parts IIA and IIB, *supra.*

Watson particularly complains that the voir dire transcript was replete with inaudible or unclear answers from the prospective jurors. While admittedly the voir dire transcript is less than ideal, Watson raised only two issues regarding voir dire: insufficient defense counsel questioning and prosecutorial peremptory challenges. These issues would not be affected by a perfect transcript. See our discussion in Parts IB and IE, *supra.* Further, because Watson used only two peremptory challenges, he waived any challenge for cause as to the jurors that did sit. See *State v. Eaton* (1969), 19 Ohio St.2d 145, 149, 48 O.O.2d 188, 190, 249 N.E.2d 897, 900. We adhere to our earlier decisions and therefore overrule proposition twenty-one.

## III

### Constitutional Issues

In propositions seventeen, nineteen and twenty, Watson makes various constitutional challenges to his death sentence.

In proposition seventeen Watson asserts that his death sentence is unconstitutional because the aggravating circumstance duplicates an element of felony murder with which he was charged. We have previously rejected this argument. *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, syllabus. See, also, *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. Proposition nineteen attacks Ohio's system of proportionality review in death penalty cases. We have previously considered and rejected this argument also. *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383. Finally, in proposition twenty, Watson launches a multifaceted challenge against Ohio's capital sentencing statute. We have already rejected these arguments in numerous capital cases from *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, to *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549. See, also, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568.

## IV

### Independent Review

R.C. 2929.05(A) requires us to independently review the appropriateness of the death sentence. We must independently weigh the evidence and determine whether the aggravating circumstances outweigh the mitigating factors.

The aggravating circumstance in this case, proved beyond a reasonable doubt, is that Watson was the principal offender of the aggravated murder of Eli Mast while committing aggravated robbery.

At the mitigation phase, Watson's counsel relied primarily on residual doubt, arguing to the jury that they were wrong and that Watson would ultimately be vindicated. Other than a rambling, unsworn statement by Watson, defense counsel called no witness and presented no evidence on Watson's behalf.

As a result of our independent review of the evidence, a number of factors lead us to conclude that a death sentence is not the appropriate penalty in this case. Residual doubt of a capital defendant's guilt may properly be considered in mitigation. *Lockhart v. McCree* (1986), 476 U.S. 162, 181, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137, 153; *State v. Gillard* (1988), 40 Ohio St.3d 226, 234, 533 N.E.2d 272, 281. In this case four disinterested eyewitnesses testified under oath that Watson was not the man they saw running from the scene of the crime. Furthermore, there is some question as to the credibility of the prosecution's witnesses: Moon and Prater saw the robber only briefly, and Toney had a strong motive to protect her stepbrother, Henderson. Additionally, the circumstantial evidence points to Henderson, not Watson.

As we have previously determined, this evidence does not constitute reversible error because, where the verdict is based on sufficient evidence, the evaluation of the evidence and the credibility of the witnesses is for the jury to determine. See our discussion in Part ID, *supra.* However, events at the penalty phase of Watson's trial could have affected the jury's choice between a life and a death sentence in the face of any residual doubts they may have had.

First, defense counsel failed to present any mitigation witnesses or evidence, other than residual doubt, on Watson's behalf. Second, the trial judge instructed the jury that their penalty verdict was only a recommendation. Such an instruction is an accurate statement of Ohio law and therefore not a violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231. However, although legally proper, such an instruction indicates to the jury that the ultimate responsibility rests with the trial judge. In a case such as Watson's, where witness credibility played a crucial role in convicting the defendant, the jury may have felt that any residual doubt would be confirmed or denied by the judge.

Based on our independent review of the evidence mandated by R.C. 2929.05, we conclude that the death sentence is an inappropriate penalty in this case. Accordingly, we need not undertake a proportionality review, and we remand this case to the trial court for imposition of a life sentence pursuant to *State v. Penix* (1987) 32 Ohio St.3d 369, 513 N.E.2d 744.

> *Judgment affirmed in part,*
> *reversed in part*
> *and cause remanded.*

MOYER, C.J., SWEENEY and WRIGHT, JJ., concur.

HOLMES, J., concurs in judgment only.

RESNICK, J., concurs in part and dissents in part.

DOUGLAS, J., dissents.

ALICE ROBIE RESNICK, J., concurring in part and dissenting in part. I concur in the majority's affirmance of appellant's conviction, but I must respectfully dissent from the reversal of the death sentence.

The majority bases its reversal of the death sentence in this case upon a theory of residual doubt. The majority states that "[r]esidual doubt of a capital defendant's guilt may properly be considered in mitigation. *Lockhart v. McCree* (1986), 476 U.S. 162, 181, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137, 153; *State v. Gillard* (1988), 40 Ohio St.3d 226, 234, 533 N.E.2d 272, 281." Reliance on *Lockhart v. McCree, supra,* is misplaced. The United States Supreme Court in *Franklin v. Lynaugh* (1988), 487 U.S. 164, 108 S.Ct. 2320,

101 L.Ed.2d 155, while commenting on the discussion of residual doubt in *Lockhart, supra,* stated, 487 U.S. at 173, 108 S.Ct. at 2325: "[A]ll that this aspect of the *Lockhart* opinion stands for is the simple truism that *where* 'States are willing to allow defendants to capitalize on "residual doubts,"' such doubts will inure to the defendant's benefit. *Lockhart, supra,* 476 U.S. at 181 [106 S.Ct. at 1769, 90 L.Ed.2d at 153]."

The General Assembly, in enacting R.C. 2929.04, set forth specific mitigating factors that can be considered when determining whether the death sentence is appropriate. Recognizing that R.C. 2929.04(B)(7) allows a defendant the opportunity to offer any factors that are *relevant* to the imposition of the death sentence, and that great latitude is given the defendant in doing so, residual doubt does not appropriately fall within this section. The reason for this is that R.C. 2929.04(B)(7) must be read in relation to R.C. 2929.04(B), which provides that the " * * * court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors[.] * * * " No mention is made of residual doubt in R.C. 2929.04(B) nor in any of the first six specific factors listed therein. If residual doubt is to be considered as a mitigating factor, it must fall within R.C. 2929.04(B)(7). Yet, the very language of that section belies this conclusion. R.C. 2929.04(B)(7) provides that the sentencing body consider "[a]ny other factors that are *relevant to the issue of whether the offender should be sentenced to death.*" R.C. 2929.04(B)(7) encompasses any other factors relating to "the nature and circumstances of the offense, the history, character, and background of the offender * * *." It does not include a lingering doubt as to a defendant's guilt or innocence.[1] Hence, it logically follows that residual doubt cannot properly be considered in the catchall section of R.C. 2929.04(B)(7).

Accordingly, residual doubt has no place in the Ohio death penalty sentencing procedure. Rather, under our theory of jurisprudence the prosecution must prove the defendant's guilt beyond a reasonable doubt. Failure upon the part of the prosecution to establish each and every element of a crime must result in a finding of not guilty. Jurors are specifically instructed that "[r]easonable doubt is not mere possible doubt, because everything relating to

---

1. The Supreme Court of Illinois recently rejected an argument that a defendant has a right to present evidence regarding residual doubts of his or her guilt during the sentencing phase. Quoting *Franklin v. Lynaugh, supra,* the court agreed that " 'residual doubt' over a defendant's guilt is not a 'mitigating circumstance' because it is not a fact about the defendant's character or the circumstances of his crime which may call for a penalty less than death." *People v. Fields* (1990), 135 Ill.2d 18, 67, 142 Ill.Dec. 200, 222, 552 N.E.2d 791, 813. Accord *Ruiz v. State* (1989), 299 Ark. 144, 164, 772 S.W.2d 297, 308.

human affairs or depending on moral evidence is open to some possible or imaginary doubt." R.C. 2901.05(D). Thus, if residual doubt is reasonable and not simply possible or imaginary, then an accused should be acquitted, and not simply have his death sentence reversed. The Supreme Court of Florida, when considering the issue of residual doubt, succinctly stated, "[a] convicted defendant cannot be 'a little bit guilty.' It is unreasonable for a jury to say in one breath that a defendant's guilt has been proved beyond a reasonable doubt and, in the next breath, to say someone else may have done it, so we recommend mercy." *Buford v. State* (1981), 403 So.2d 943, 953.

It follows that under Ohio law in order to use a theory of residual doubt to set aside a death penalty, it must be found as a mitigating factor in R.C. 2929.04. Had the General Assembly wanted the sentencing jury to revisit the question of the defendant's guilt when considering the imposition of the death sentence, it certainly could have provided explicit language which would specifically include residual doubt as a mitigating factor. Rather, the theory of residual doubt is not found anywhere in the Ohio statute. This court seems to be creating another mitigating factor—now known as residual doubt—and does so by judicial legislation. See *State v. Gillard, supra,* 40 Ohio St.3d at 234–235, 533 N.E.2d at 281. In *Gillard* the court only mentioned residual doubt in passing while considering the issue of effective assistance of counsel. Today, the majority has taken a quantum leap to give residual doubt the status of a mitigating factor under our statutory framework. This is dangerous precedent, especially in view of the fact that following the United States Supreme Court decision in *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, the General Assembly amended R.C. 2929.04(B) and added additional mitigating factors. Hence, the state legislature has had an opportunity to consider the issue of residual doubt. It chose not to add residual doubt as a mitigating factor.

Justice Sandra Day O'Connor, in her concurring opinion in *Franklin v. Lynaugh, supra,* 487 U.S. at 187–188, 108 S.Ct. at 2334–2335, stated clearly that "[i]n my view, petitioner's 'residual doubt' claim fails, not because the Texas scheme allowed for consideration of 'residual doubt' by the sentencing body, but rather because the Eighth Amendment does not require it. Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some States have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial, see *Lockhart v. McCree,* 476 U.S. 162, 181 [106 S.Ct. 1758, 1768, 90 L.Ed.2d 137, 153] (1986), but we have never indicated that the Eighth Amendment requires States to adopt

such procedures.  To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of 'residual doubts' about guilt.  * * * '[R]esidual doubt' about guilt is not a mitigating circumstance.  *We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense,* that may call for a penalty less than death.  See *California v. Brown*, 479 U.S. [538], at 541 [107 S.Ct. 837, 839, 93 L.Ed.2d 934, 939 (1987)]; *id.*, at 544 [107 S.Ct., at 840, 93 L.Ed.2d, at 941–942] (O'CONNOR, J., concurring); *Eddings* [*v. Oklahoma*], 455 U.S. [104], at 110, 112 [102 S.Ct. 869, 875, 71 L.Ed.2d 1, 8, 9 (1982)]; *id.*, at 117 [102 S.Ct., at 878, 71 L.Ed.2d, at 12] (O'CONNOR, J., concurring); *Lockett*, 438 U.S., at 605, 98 S.Ct., at 2965, 57 L.Ed.2d, at 990.  'Residual doubt' is * * * a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'  Petitioner's 'residual doubt' claim is that the States must permit capital sentencing bodies to demand proof of guilt to an 'absolute certainty' before imposing the death sentence.  Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing."  (Emphasis added.)

Nor is there anything in R.C. 2929.04 which authorizes the consideration of residual doubt when considering the death sentence or requires this heightened burden of proof.  In this case, no mitigating factors were even presented for consideration.  All that was offered in mitigation was an unsworn statement by Watson.  This was a senseless, coldblooded killing during the course of a robbery.  There were three eyewitness in close proximity to the killing.  The defense presented other witness who observed the killer after the crime.  Both the trial jury, who heard all the evidence in the guilt and penalty phases, and the trial court, in reviewing the jury's recommendation, chose to impose the death sentence.  The appellate court after independent review of the evidence affirmed the trial court's decision to impose the death penalty.  The majority, because of some possible, whimsical or residual doubt as to the identity of the killer, has seen fit to set aside the death sentence, thus establishing residual doubt as an additional mitigating factor.  Residual doubt has no place in the sentencing phase under the Ohio statutory framework as it is written.  I would affirm both the conviction and the death sentence.