OPINION
Defendant-appellant, William F. Kroger, appeals his conviction for operating a motor vehicle while under the influence of alcohol ("OMVI"), his fourth OMVI offense in six years.
At approximately 11:30 p.m. on January 10, 1998, Deputy Vincent Vetter of the Clermont County Sheriff's Office was patrolling State Route 125 near its intersection with State Route 222 in Clermont County, Ohio. In his rear view mirror, Dep. Vetter noticed an approaching car with an inoperable left headlight. Dep. Vetter allowed the car to pass and then stopped the car for the headlight violation.
Dep. Vetter called in the stop and approached the car. Appellant exited his vehicle and asked why he was being stopped. Dep. Vetter informed appellant about the inoperable headlight. Appellant went to the front of his car and hit the hood in an attempt to jar the headlight into operation. The headlight remained inoperable.
Dep. Vetter asked appellant to get back in the car and provide identification. Appellant told Dep. Vetter that he did not have a driver's license on him and that he was supposed to be driving a different vehicle that was equipped with an interlock device. The device would prevent appellant from driving the vehicle if he was intoxicated. Dep. Vetter ordered appellant to turn off the vehicle appellant had been driving. Dep. Vetter noticed at that time that appellant's eyes were glassy and bloodshot. When asked if he had been drinking, appellant said that he had not.
Dep. Vetter returned to his patrol cruiser and called in appellant's social security number. He also turned on the patrol cruiser's overhead video camera. Dep. Vetter returned to appellant's vehicle and asked appellant to perform field sobriety tests. Dep. Vetter administered the horizontal gaze nystagmus ("HGN") test, the walk and turn test, and an alphabet test. Appellant failed the three tests. Based upon appellant's glassy, bloodshot eyes and failure to pass the field sobriety tests, Dep. Vetter arrested appellant for OMVI.
While transporting appellant to a local police station to perform a breath test, Dep. Vetter noticed an odor of alcohol emanating from appellant. At the police station, appellant refused to take the breath test. Dep. Richard Corder, who was to administer the breath test, noticed that appellant smelled of alcohol. Dep. Vetter drove appellant to the county jail, where Dep. Michael Walker, the booking officer, noticed that appellant exhibited an odor of alcohol and glassy eyes.
On April 1, 1998, the grand jury returned an indictment against appellant charging him with OMVI, in violation of R.C.4511.19(A)(1), a fourth degree felony because the indictment included a specification that this was appellant's fourth OMVI offense in less than six years. On October 13, 1998, the case proceeded to trial. That jury was discharged for failing to reach a verdict, and a new trial was scheduled. On March 4, 5, and 8, 1999, a second trial was held. The three deputies testified as to appellant's arrest, refusal to take the breath test, and booking into the county jail. They testified that appellant smelled of alcohol and had bloodshot, glassy eyes. Dep. Vetter testified that appellant failed the field sobriety tests.
In his defense, appellant presented his stepbrother and the official responsible for maintaining the ignition interlock device. Appellant testified that he did not drink the night of his arrest. He stated that he had been driving the non-interlock vehicle because he had spilled kerosene on himself earlier that night and was afraid that the fumes would set off the interlock device. Appellant testified that he had driven that night, even though he had only occupational driving privileges, to help out his stepbrother who was stranded after a domestic dispute.
The jury found appellant guilty. On April 19, 1999, appellant was sentenced to serve twelve months in the Clermont County jail, consecutive to any sentence that may be imposed in the Clermont County Municipal Court as a consequence of the OMVI offense.[1] Appellant's driver's license was revoked, his license plates were impounded, his vehicle was forfeited to the Sheriff's Office, and appellant was ordered to pay a $1,000 fine. Appellant appeals, raising two assignments of error.
Assignment of Error No. 1:
 THE APPELLANT WAS PREJUDICED BY THE SUBSTANTIAL INTERFERENCE WITH HIS RIGHT TO A FAIR TRIAL DUE TO THE PROSECUTOR'S IMPROPER COMMENTS.
In his first assignment of error, appellant contends that the prosecutor engaged in misconduct in his closing argument by repeatedly stating that appellant was lying. Appellant argues that, as a result, the jury was unfairly prejudiced against him.
Because these matters were not objected to at trial, the issue is waived unless the errors rise to the level of "plain error."State v. Nicholas (1993), 66 Ohio St.3d 431, 435-436. Under plain error analysis, we must determine whether the substantial rights of the accused are so severely affected as to undermine the fairness of the guilt-determining process. Crim.R. 52(B);[2]State v. Swanson (1984), 16 Ohio App.3d 375, 377. It must appear that, but for the error, the result of the trial clearly would have been otherwise and that to not correct the error would be a clear miscarriage of justice. State v. Bock (1984), 16 Ohio App.3d 146,150.
The test for prosecutorial misconduct is whether the remarks made by the prosecution were improper and, if so, whether they prejudicially affected substantial rights of the accused. Statev. White (1998), 82 Ohio St.3d 16, 22, rehearing/reconsideration denied (1998), 82 Ohio St.3d 1469, 1470, certiorari denied,525 U.S. 1057, 119 S.Ct. 623; State v. Smith (1984), 14 Ohio St.3d 13,14. Even if a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted "only if [they] `permeate the entire atmosphere of the trial.'"State v. Tumbleson (1995), 105 Ohio App.3d 693, 699, quotingUnited States v. Warner (C.A.6, 1992), 955 F.2d 441, 456, certiorari denied (1992), 505 U.S. 1227, 112 S.Ct. 3050. When reviewing the record, it must be remembered that both the defense and prosecution are given wide latitude in their arguments "as to what the evidence has shown and what reasonable inferences may be drawn therefrom." Tumbleson, 105 Ohio App.3d at 699, quotingState v. Lott (1990), 51 Ohio St.3d 160, 165, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591. In examining the prosecutor's arguments for possible misconduct, we must review the argument as a whole, not in isolated parts, and we must examine the argument in relation to that of opposing counsel. See Statev. Moritz (1980), 63 Ohio St.2d 150, 157-158.
If the prosecutor does state an opinion, it must be based upon the evidence presented and not personal beliefs. State v. Watson
(1991), 61 Ohio St.3d 1, 10. Prosecutors must avoid insinuations and assertions calculated to mislead the jury and refrain from expressing a personal opinion as to the credibility or guilt of the accused. Smith, 14 Ohio St.3d at 14. It is improper for a prosecutor to state that the defendant is a liar or that he believes the defendant is lying. State v. Rahman (1986), 23 Ohio St.3d 146,154. However, a prosecutor may suggest that the evidence demonstrates that the defendant is lying, scheming or has ulterior motives. State v. Draughn (1992), 76 Ohio App.3d 664,670; State v. Gunn (Aug. 7, 1998), Montgomery App. No. 16617, unreported; State v. Payne (Dec. 30, 1996), Lucas App. No. L-95-317, unreported.
At trial, appellant contended that the deputies did not smell alcohol. Instead, he asserted that he had earlier spilled kerosene on his pants leg and that the deputies smelled those fumes. In the first trial, appellant testified very clearly that the deputies smelled only kerosene and that the kerosene had caused his eyes to become glassy and bloodshot. Appellant was equivocal in his testimony at the second trial. At the second trial, appellant testified that the kerosene was dried and that it did not smell strongly. All three deputies testified that they smelled alcohol, not kerosene. Two of the deputies testified that they personally knew the smell of kerosene, and that appellant exhibited no such smell.
In closing arguments, the prosecutor pointed out the inconsistencies between appellant's testimony at the two trials. He argued that appellant's testimony could not be believed for many reasons. First, it conflicted with the testimony of all three deputies. Second, appellant's testimony at the second trial contradicted his testimony at the first trial. Third, appellant's stepbrother testified that he did not smell kerosene when in appellant's vehicle earlier that night. Fourth, appellant chose to drive the vehicle without the court-ordered interlock device, which could be inferred as an attempt to avoid the device's purpose, i.e., to prevent him from driving while intoxicated. The prosecutor argued that appellant had a very strong motive to claim that he smelled of kerosene: by drinking, appellant would violate probation for previous offenses. The prosecutor urged that this was a reason for appellant to refuse the breath test.
After pointing out the inconsistencies in appellant's testimony and how appellant's testimony was contrary to the testimony of other witnesses, the prosecutor extensively attacked appellant's credibility and the credibility of his defense (challenged portions emphasized):
 [T]he Defendant refused to take the [breath] test. Why? There's only one explanation. There's only one explanation. Because he knew that the result of that test would show him to be lying
about his statement that he was [not] under the influence of alcohol. * * * [H]e denied you the one piece of scientific proof which would support his claim that he didn't drink and drive. * * * Why did he deny you that? Because he knows that he was lying, he knows that he's guilty, and that he was doing everything he can to avoid being held accountable for his actions. And, ladies and gentlemen, I submit to you that that lie is one of the most important pieces of evidence which establishes the Defendant's guilt.
 Obviously credibility is something that you all are going to have to decide. * * * You all have had an opportunity to watch the Defendant's demeanor while other witnesses are testifying. You all have had an opportunity to watch the Defendant's demeanor while he was testifying. Use the normal tests of credibility that you apply in your everyday lives, use the visual signs which you picked up from the Defendant, and you determine whether you think he was telling the truth. And when you're doing that, compare that with the reasonableness of his testimony in conjunction with everything else that was presented. The lie "I did not have a drop to drink". Ladies and gentlemen, based upon the evidence, I submit to you that's absurd.
 "How do you explain the odor of alcohol?" Well, in October he explains it [in the first trial]. It had to be the kerosene. And that's so silly it doesn't justify further comment. He realizes that it's so silly, so now he comes in here and says, "I can't give you an explanation." But he's stuck with what he said before. He's lying right there. He's lied once. Is there any doubt in anyone's mind here that he would lie again to avoid being held accountable for this?
* * *
 [I]f you don't believe him, ladies and gentlemen, then you have to ask yourself, "Why would he lie? Why would he lie?" In order to believe him, you have to believe the convergence of a set of circumstances which were just incredibly bad luck for him. You have to believe that he had the misfortune of spilling kerosene on his leg when he was fueling up his heater. * * * Then you have to believe that he had the further bad luck of his stepbrother being stranded[.] * * * Then you have to believe that despite the fact that he's got at least two hours to get from Bethel to Amelia and back, he makes the decision that that's not enough time, so he's going to drive the car without Ignition Interlock. * * *
 [T]here's bad luck yet, another one of those circumstances, * * * that headlight shorts out, and as a result of that he gets pulled over by Deputy Vetter. And again it's bad luck that, according to his testimony, he spilled the kerosene early, roughly 8:30, and three hours later, according to his testimony in October, the kerosene was strong enough that it made his eyes red, the kerosene being another explanation offered by him for why his eyes were red. He says that he had the [car] windows open. His stepbrother says that the windows were closed. It was January, January 10th. And then it's just bad luck that now he [the stepbrother] couldn't remember smelling the kerosene. And now he's [appellant] not going to say that must have been what the officer smelled, because he's decided finally that that's absurd.
 And then he's got the bad luck to have — and if you believe his theory, you've got to believe that Deputies Vetter, Corder, and Corrections Officer Walker have about the worst sense of smell that God ever created, and he's got the bad luck of all three of those individuals independently mistake the aroma of kerosene for the aroma of alcohol coming from his body, from his person.
 Now, if you believe that all those elements of bad luck converged against the Defendant and resulted in him wrongfully being prosecuted, charged with this offense and brought in here today, if you believe that, acquit him, find him not guilty. If you don't believe that, if that doesn't jive with your sense of common sense and logic, then ask yourself, ladies and gentlemen, "Why is he lying?" And I submit to you it's very simple; he's lying because he's guilty. Innocent people don't lie. Innocent people who haven't had a drop to drink don't refuse to take a breathe test. Ladies and gentlemen, you are the only ones that can hold the Defendant accountable for his actions, accountable for his lies, accountable for him getting behind the wheel again under the influence of alcohol.
After appellant's closing argument, the prosecutor again attacked appellant's version of the facts in the state's rebuttal argument:
 First and foremost, I'd like to address the issue of a prior statement, the Defendant's statement testimony back in October. I asked him [in the second trial], "What's the explanation," and he said, "I don't know, I don't have an explanation for what they smelled. They weren't smelling alcohol." And he would not say that it was kerosene. And, in fact, his testimony Friday was that he couldn't even smell the kerosene. * * *
 Now, back in October [at the first trial], * * * his statement was in response to a question from his own attorney, "How do you explain the fact there was testimony they said your eyes were glassy and they thought they smelled an aroma that may have contained an alcoholic beverage, * * * his answer was, "I can tell right now that the only thing they did smell was kerosene and that's why my eyes were red. Kerosene was his explanation * * *. That, ladies and gentlemen is not a minor discrepancy; that is a gross deviation. Ask yourself why. Because the odor of kerosene cannot be mistaken for the odor of alcohol. And in the three or four months that he's had to reflect on that, he's come to that conclusion. So, he's not trying to convince you all of the absurdity of that, so now he's tried to back off of it. He can't back off from it, because it was a statement given under oath that was transcribed.
 * * * Assume that everything that he [appellant] testified to under oath in October was consistent with what he said Friday [in the second trial]. It's still absurd. It's still ludicrous. His testimony simply doesn't make any sense. So, if he's being consistent in his lies, is that an argument to be made to bolster his credibility? I submit to you that it's not. It's indicative of the fact that he has no credibility, he's being dishonest and he's trying to skate on his fence * * *. And it's my hope that you will not allow him to do that.
* * *
 The statement was made [by appellant's counsel], "This is not a case about what the Defendant smelled like." Well, I respectfully disagree. I think in part that's exactly what this case is about. That's not, if you find that he smelled like alcohol, that doesn't automatically mean that he's guilty of the offense charged; but I submit to you that, given the circumstances of this case, that it is a very important factor that you can rely upon in making that decision, because it directly contradicts his own statements.
 And then and I'll probably say this five more times before I sit down. Ask yourself, why did he lie? If he smells like alcohol, he had to consume some alcohol. He says he didn't consume any. Why would he lie?
 * * * [T]he Judge will tell you that you can consider the fact that he refused to take a breath test as evidence, that he was aware he was under the influence. You can consider that. I strongly suggest that you consider that. Common sense demands that you consider that as evidence.
* * *
 Why didn't he drive the car with the Ignition Interlock? He's been drinking. Why didn't he take the test? He's been drinking. Ladies and gentlemen, that's what I'd like to leave you with. Why? I'd ask that you consider some of these questions when your back during your deliberations. If he, in fact, spilled kerosene on his clothing and you're going to have to make that determination. Nobody else smelled it. Nobody else saw any stains on his clothing. If he spilled kerosene on his clothing, why didn't he change his clothes and shoes? Why did he drive the car, the Camaro, the car that did not have Ignition Interlock, when he's got two hours to get from Bethel to Amelia and back? Why? Why did the Defendant exhibit six out of six possible clues on the horizontal nystagmus test? Why were the Defendant's eyes bloodshot and glassy? Why could the Defendant not follow the simple instructions [given by Dep. Vetter]? Why couldn't he do that? * * * If he wasn't drinking alcohol that night, why did he smell like alcohol? Why did he refuse the one piece of scientific evidence which would completely exonerate him if he hadn't drank anything like that? Why would he refuse the breath test? And finally, ladies and gentlemen, why would he lie? * * * If you believe he did not have a drop to drink, your decision is very, very, easy. If you do not believe the testimony, then ask yourself why would he lie? Self preservation. He's on the line. He's doing everything he can to avoid responsibility and accountability for his conduct on January 10th. I'm doing everything in my power to hold him accountable. Now it's up to you.
Appellant contends that this argument that his version of the facts was too incredible to believe constituted prosecutorial misconduct warranting a new trial. Although it is true that a prosecutor should not express a personal belief as to a defendant's credibility, the rule was not designed to prevent a prosecutor from emphasizing that the defendant's contentions are not believable or that the defendant's testimony is inconsistent. Where the evidence logically supports an argument or opinion that the defendant's version of the facts is not credible, the prosecutor does not commit misconduct by pointing out such a conclusion. Watson, 61 Ohio St.3d at 10.
The prosecutor's statements, when taken in the full context in which they were made — rather than the short phrases challenged by appellant — are supported by the evidence. Although we are concerned by the prosecutor's statements to the effect that only the guilty lie, we cannot say that the prosecutor's closing argument, as a whole, was so extreme as to prejudice appellant's right to a fair trial. The inconsistency of appellant's testimony and its conflict with the testimony of his stepbrother and the deputies can be inferred to demonstrate that appellant was not being truthful. The prosecutor repeatedly asked the jury to weigh the evidence, and only if they found appellant's testimony not credible, to ask if and why appellant would lie. We must caution, though, as we have in the past, that had there not been evidence in this case logically suggesting that appellant's version of events was not credible or evidence demonstrating appellant's guilt, we might have arrived at a different conclusion. See Statev. Ross (Oct. 25, 1999), Clermont App. No. CA99-01-004, unreported. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN IMPOSING A CONSECUTIVE SENTENCE FOR A FIRST-TIME FELONY OMVI OFFENSE.
In his second assignment of error, appellant contends that the trial court did not have authority to sentence him to serve a consecutive jail term. The state concedes that the sentence was improper pursuant to R.C. 2929.41.
Because sentencing for OMVI offenses concerns so many sections of the Revised Code, we begin with a detailed exposition of the relevant sections. Initial sentencing guidelines for OMVI offenses are provided in R.C. 4511.99, which states in pertinent part:
 (A)(4)(a) If, within six years of the offense, the offender has been convicted of or pleaded guilty to three or more [OMVI] violations * * *, the offender is guilty of a felony of the fourth degree. The court shall sentence the offender in accordance with sections 2929.11 to 2929.19 of the Revised Code and shall impose as part of the sentence a mandatory term of local incarceration of sixty consecutive days of imprisonment in accordance with division (G)(1) of section 2929.13 of the Revised Code * * *.
* * *
 (c) As used in division (A)(4)(a) of this section, * * * "mandatory term of local incarceration" [has] the same meaning as in section 2929.01 of the Revised Code.
R.C. 2929.13(G) states:
 Notwithstanding divisions (A) to (E) of this section, if an offender is being sentenced for a fourth degree felony OMVI offense, the court shall impose upon the offender a mandatory term of local incarceration or a mandatory prison term in accordance with the following:
 (1) Except as provided in division (G)(2) of this section [providing for imposing a prison term], the court shall impose upon the offender a mandatory term of local incarceration of sixty days as specified in division (A)(4) of section 4511.99 of the Revised Code * * *. The court that imposes a mandatory term of local incarceration * * * shall specify whether the term is to be served in a jail, a community-based correctional facility, a halfway house, or an alternative residential facility * * *. The court shall not sentence the offender to a prison term and shall not specify that the offender is to serve a mandatory term of local incarceration in a prison.
Additional sanctions for OMVI offenses are provided in R.C.2929.16:
 (A) The court imposing a sentence for a felony upon an offender who is not required to serve a mandatory prison term may impose any community residential sanctions under this section. The court imposing a sentence for a fourth degree felony OMVI offense upon an offender who is required to serve a mandatory term of local incarceration pursuant to division (G)(1) of section 2929.13 of the Revised Code may impose upon the offender, in addition to the mandatory term of local incarceration, a community residential sanction or combination of community residential sanctions under this section, and the offender shall serve or satisfy the sanction or combination of sanctions after the offender has served the mandatory term of local incarceration required for the offense. Community residential sanctions include, but are not limited to, the following:
* * *
 (3) If the offender is convicted of a fourth degree felony OMVI offense and is sentenced pursuant to division (G)(1) of section 2929.13 of the Revised Code, subject to division (D) of this section, a term of up to one year in jail less the mandatory term of local incarceration of sixty days consecutive days of imprisonment imposed pursuant to that division[.]
R.C. 2929.41 provides for ordering consecutive felony sentences of imprisonment:
 (A) Except as provided in division (B) of this section, division (E) of section 2929.14, or division (D) or (E) of section 2971.03 of the Revised Code, a sentence of imprisonment shall be served concurrently with any other sentence of imprisonment * * *. In any case, a sentence of imprisonment for misdemeanor shall be served concurrently with a sentence of imprisonment for felony * * *.
 (B)(1) A sentence of imprisonment for a misdemeanor shall be served consecutively to any other sentence of imprisonment when the trial court specifies that it is to be served consecutively or when it is imposed for a misdemeanor violation of section 2907.322, 2921.34, or 2923.131 of the Revised Code.
 (2) When consecutive sentences of imprisonment are imposed for misdemeanor, the term to be served is the aggregate of the consecutive terms imposed, except the aggregate term to be served shall not exceed eighteen months.
Under these provisions, a trial court may sentence an offender to a term of local incarceration of up to one year. R.C.2929.16(A)(3). Of that one year term of local incarceration, a minimum of sixty days must be served. R.C. 2929.13(G) and 4511.99(A)(4)(a).
In applying these provisions, the statutory definition of certain terms must be considered. "Mandatory term of local incarceration" is defined in R.C. 2929.01(KK):[3]
 [T]he term of sixty days in a jail, a community-based correctional facility, a halfway house, or an alternative residential facility that a sentencing court is required to impose upon a person who is convicted of or pleads guilty to a fourth degree felony OMVI offense pursuant to division (G)(1) of section 2929.13 of the Revised Code and division (A)(4) of section 4511.99 of the Revised Code.
"Jail" is defined in R.C. 2929.01(V):
 [A] jail, workhouse, minimum security jail, or other residential facility used for the confinement of alleged or convicted offenders that is operated by a political subdivision or a combination of political subdivisions of this state.
"Prison term" is defined in R.C. 2929.01(DD) to include:
(1) A stated prison term;
 (2) A term in a prison shortened by of with the approval of, the sentencing court * * *.
 (3) A term in prison extended by bad time imposed pursuant to section 2967.11 of the Revised Code or imposed for a violation of post-release control * * *.
"Prison" is defined in R.C. 2929.01(CC):
 [A] residential facility used for the confinement of felony offenders that is under the control of the department of rehabilitation and correction * * *.
As this court noted in State v. Maloney (Sept. 27, 1999), Clermont App. No. CA99-01-006, unreported, there is a distinction between "jail" and "prison," and, therefore, between "local incarceration" and a "prison term." Id. at 6. See, also, Xenia v. Allison (Feb. 11, 2000), Greene App. No. 99 CA 85, unreported. A "prison term" is served in a "prison," which is under the authority of the department of rehabilitation and correction. A term of "local incarceration" is served in a "jail" or other residential facility run by political subdivisions of the state. The effect of these distinctions is important when determining whether a trial court may impose consecutive sentences in a given case.
In Maloney, the defendant was serving a one year prison term when he was sentenced for a first-time felony OMVI offense to serve a twelve month term of local incarceration, consecutive to his current prison term. This court found that the trial court was without authority to impose the consecutive sentence, holding:
 A plain reading of R.C. 2929.14(E)(4), which addresses consecutive sentencing when there are "multiple prison terms" in conjunction with 2929.13(G)(1), which prohibits a court to impose a "prison term" on a first time DUI felony offender, leads to the conclusion that the jail term of a first-time DUI felony offender cannot be imposed consecutively to a prison term under R.C. 2929.14(E)(4).
Id. at 7.
The authority to impose consecutive terms of imprisonment is granted by R.C. 2929.41 and 2929.14(E). R.C. 2929.41(A) mandates that, except under certain circumstances not applicable here, "a sentence of imprisonment shall be served concurrently with any other sentence of imprisonment." R.C. 2929.41(B) allows for a consecutive misdemeanor sentence. R.C. 2929.14(E) sets forth when a consecutive prison term may be imposed, but that section, as noted in Maloney, is limited to "prison terms." If a "prison term" is not being imposed upon an offender, and there is no misdemeanor sentence, the general mandate of R.C. 2929.41(A) governs, and the sentence of local incarceration for a felony must be served concurrently with any other term of imprisonment.Maloney, at 7.
In the instant case, appellant was sentenced for a fourth degree OMVI felony to a one year term of local incarceration pursuant to R.C. 2929.16(A)(3). R.C. 2929.41(A) directs that only a concurrent sentence may be imposed under these circumstances. The trial court imposed a consecutive sentence which was contrary to law, and the sentence is vacated insofar as it was ordered consecutive to the municipal court sentence.[4] R.C.2953.08(G)(1)(d). Appellant's second assignment of error is well-taken.
Judgment affirmed in part and vacated in part.
POWELL, P.J., concurs.
VALEN, J., dissents.
[1] The record provides no indication as to the basis of the municipal charge.
[2] Crim.R. 52(B) states:
 Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.
[3] R.C. 2929.01 was amended as of March 23, 2000. Because this case precedes that amendment, we consider the former version of the statute.
[4] Although we have not addressed the issue, we must note that the trial court's sentence was improper for the further reason that it was ordered consecutive to a sentence that, at that time, did not exist. Before a sentence may be ordered consecutive to another sentence, the other sentence must either have been imposed or be imposed simultaneously with the consecutive sentence.