OPINION
Appellants, Rachel and Lloyd Keltner, appeal a judgment from the Court of Common Pleas of Butler County, Juvenile Division, that granted permanent custody of two of their children, Tabitha Keltner (DOB 5/31/94) and Austin Keltner (DOB 11/21/95), to the Butler County Children Services Board ("BCCSB"). Following a thorough review of the record, we affirm the trial court's judgment.
Appellants have been involved with BCCSB since before Tabitha and Austin were born. BCCSB initially became involved with appellant, Rachel Mosley Keltner ("Rachel"), in September 1991 when allegations were raised that her then-paramour, Dean Scott Lyttle ("Lyttle"),[1] was sexually abusing her daughter, Samantha Mosley (DOB 8/31/88). As a result of the investigation, Rachel gave a statement to police in which she admitted that Lyttle had confessed to spending time in jail for sexually abusing another child. Rachel also admitted that she suspected Lyttle was abusing Samantha, that Lyttle had forced her to perform oral sex on Samantha while he masturbated, and that Lyttle had forced Samantha to perform oral sex on Rachel. During her time with Lyttle, Rachel gave birth to a son, Matthew Lyttle (DOB 11/3/89). Samantha was adjudicated to be an abused and neglected child, and Matthew was adjudicated to be a dependent child.
At the request of BCCSB, Rachel was subjected to an extensive psychological evaluation by Dr. Charles Lee in 1991. Dr. Lee reported that Rachel's profile was descriptive of an individual with the capacity for destructive and assaultive behavior and was often associated with individuals who exhibit violence in bizarre ways. Dr. Lee noted that Rachel was "not someone who can accept responsibility for her own behavior. She prefers to blame others and present herself as a helpless victim." Dr. Lee's prognosis for Rachel was "extremely guarded" as he noted that "such individuals are generally unreceptive to psychotherapy."
In August 1992, Rachel underwent a second psychological evaluation with Dr. Lee. Again, Dr. Lee found her to be "quite defensive and guarded." At the time of the second evaluation, Rachel was involved with a new paramour, appellant, Lloyd Keltner ("Lloyd"). Rachel and Lloyd eventually married. Rachel was evaluated a third time by Dr. Lee in December 1992. At that time, Dr. Lee noted that she "responded in such a defensive and guarded manner that her overall profile is invalid."
Dr. Lee was also familiar with Lloyd as he had subjected Lloyd to extensive psychological testing in October 1987. The testing was completed in connection with a BCCSB investigation into a sexual abuse allegation involving Lloyd and his three younger sisters. Lloyd admitted to having an incestuous relationship with his sisters, and to fathering a child with one sister, Crystal. The child born of that union was named Felicia Keltner. In October 1992, Dr. Lee subjected Lloyd to a second set of psychological tests, and concluded that Lloyd was a naive and immature man. Further, Dr. Lee noted that while Lloyd recognized that sexual abuse was wrong, "he simply believes that he will never do it again because he has made up his mind in that direction." Dr. Lee then stated "this examiner can determine no deterrents to future abuse which are currently in place."
Also in 1992, BCCSB provided Rachel and Lloyd with therapy and counseling. Both Rachel and Lloyd were seen by Jim Sarris ("Sarris"), a licensed social worker employed with Catholic Social Services. Rachel was seen in connection with an adult abuse awareness group, while Lloyd was seen in connection with a group for men who have sexually offended children. Sarris testified that Rachel was "extremely resistant, guarded, angry, impulsive and closed minded." While Rachel's attendance at group was regular, Sarris testified: "we felt due to her resistance there was no more we could work with her. * * * Actually, prognosis I felt was poor and that she did not seem to be a viable therapeutic client."
With respect to Lloyd, Sarris expressed serious concern because Lloyd had not completed more than seven (7) sessions with the group. Sarris, who testified at the depositional hearing as an expert therapist, stated:
 It's a general therapeutic therapists belief among therapists that once a man offends, somewhat like an alcoholic, he needs to know that * * * [t]here's always a chance to reoffend. He's already crossed that line. He's already shown that he can come up with his own thinking manipulations to give himself permission to offend given the right situation and given the proper environment he may offend again, and that the risk is always there, that he has to watch his high risk factors, he has to stay away from them, he has to know what triggers him, he has to be able to speak about the abuse clearly. It's a common belief among the experts that a man has to be able to describe his offenses clearly, state the specifics of the crime, be able to empathize with the victims, know how they feel, know what they feel, and know his triggers, know what prompted him to do it, * * * and the rule of thumb is no less than eighteen months in pretty intensive offenders specific work.
Sarris testified that he saw no progress with Lloyd at all. In contrast, both Rachel and Lloyd testified that they left therapy with Sarris because they felt he was "against" them and believed they were "bad persons."
In April 1993, Ryan Keltner was born to Rachel and Lloyd (DOB 4/3/93). BCCSB filed a motion for permanent custody of Ryan on April 5, 1993. In May 1993, both Samantha Mosley and Matthew Lyttle were placed in the legal custody of a paternal aunt and uncle. Rachel's visitation was suspended indefinitely.
In conjunction with Ryan's 1993 permanent custody case, Rachel and Lloyd were examined by Dr. Joseph Cresci. Dr. Cresci recommended that custody of Ryan Keltner "not be granted to Mr. and Mrs. Keltner." Following examination, Dr. Cresci described Lloyd as "socially isolated" and "chronically depressed." He went on to state that Lloyd had "all the characteristics of a potential physical abuser of children." Following examination, Dr. Cresci described Rachel as a woman who feared responsibility, and would "likely tolerate * * * verbal abuse and humiliation of her children."
In May of 1994, Rachel gave birth to her and Lloyd's second child together, Tabitha. In January 1995, permanent custody of Ryan was awarded to BCCSB.
Shortly thereafter, in April 1995, and in May 1995, BCCSB received referrals that Lloyd was sexually abusing Felicia, the child he had fathered with his sister, Crystal. While BCCSB was able to determine that Felicia had been sexually abused, they could not affirmatively identify the perpetrator. BCCSB did establish, however, that Lloyd had had contact with Felicia during this time, and Felicia was adjudicated to be a sexually abused, neglected and dependent child. In October 1995, Rachel and Lloyd moved out of the state of Ohio. The Keltner's third child, Austin, was born out-of-state in November 1995.
In March 1996, BCCSB received a referral that Rachel and Lloyd were residing at St. Raphael's Shelter in Hamilton, Ohio. Tenants at the shelter suspected that Rachel and Lloyd were physically and sexually abusing Tabitha and Austin. The suspicions stemmed from a report that Austin's diaper had blood in it, and from witness reports that Rachel and Lloyd had been heard hitting the children.
On March 29, 1996, BCCSB filed a complaint of dependency with the Butler County Court of Common Pleas, Juvenile Division, on behalf of Tabitha and Austin. Although BCCSB requested permanent custody of the children, the trial court granted BCCSB temporary custody. The children were placed in foster care.
On April 20, 1996, Austin was taken to the hospital due to bleeding around the top of his penis. Cheryl Osborn, one of the BCCSB caseworkers assigned to the Keltner investigation, testified that hospital doctors diagnosed Austin with a staph infection which they believed to have been present for quite some time.
The adjudicatory hearing was held on November 15, 1996. Appellants were present at the hearing and represented by counsel. Rachel and Lloyd agreed to stipulate that Tabitha and Austin were dependent children. At the hearing, the following colloquy took place:
 BY THE COURT: * * * is there anything you want to put on the record at all, any statement further?
MS. DOWNING [Prosecutor]: No sir. No.
 BY THE COURT: The Court would find that the children are dependent.
At no time did the trial court elicit any personal response from appellants regarding the agreed stipulation. The trial court filed its "Adjudication and Dispositional Hearing Final Judgement Entry," and granted BCCSB temporary custody of Tabitha and Austin. Also on November 15, 1996, appellants' appointed counsel withdrew from representation, and new counsel was appointed to represent appellants.
On March 26, 1997, BCCSB renewed its motion for permanent custody and a dispositional hearing was set for July 24, 1997. The dispositional hearing was continued on August 14, 1997. At both hearings, Rachel and Lloyd were present and represented by counsel.
At the dispositional hearing, Dr. Sherry Baker, a psychologist at the Children's Diagnostic Center to whom Rachel and Lloyd had been referred by BCCSB, testified:
 in light of their significant personality disorders, their [Rachel and Lloyd's] ability to parent is compromised. They have not been able to benefit from the treatment interventions in the past, their personality disorders are such that it would be unlikely, they would * * * benefit from interventions in the future, and given their history, the children would be considered at risk.
Dr. Baker further testified that she did not believe future therapy or counseling for Rachel and Lloyd would be beneficial as their "personality characteristics" were "enduring and resistant." They have had "considerable services," she testified, but by their own "self report they've not changed their thinking * * * and as I said their personality constellations are such that they're not likely to benefit from intervention."
Dr. Roger Fisher, clinical psychologist, also testified at the dispositional hearing. At the request of appellants' counsel, Dr. Fisher subjected Rachel and Lloyd to a battery of psychological tests in order to form an opinion about their ability to parent. Dr. Fisher, like Dr. Lee and Dr. Baker, concluded that Rachel and Lloyd have very serious psychological problems.
In a report prepared for appellants' counsel, Dr. Fisher stated that test results revealed that Lloyd was not one to seek psychological treatment, and he was a poor candidate for psychotherapy. The testing also revealed that Lloyd fit the profile of one who tends "to rationalize or blame others for their problems. They tend to leave therapy prematurely and blame the therapist for their own failings." With respect to Lloyd's ability to parent, Dr. Fisher testified:
 I think that he has an emotional control problem such that he loses control. I think he becomes verbally aggressive, violent, and the history suggests that even has been sexually involved with children, and I think that represents a very high risk at this point.
Dr. Fisher's testing of Rachel was no more favorable:
 An individual [with Ms. Keltner's] profile is usually viewed as having a severe Personality Disorder, such as an Antisocial or Paranoid Personality. * * * Persons with [similar test scores] tend not to seek psychological treatment on their own and are usually not good candidates for psychotherapy.
With respect to Rachel's ability to parent, Dr. Fisher testified:
 She has an ability to relate one to one to children that I observed several times * * * I think she could provide a child's day to day care. My concern about her as a safe parent however is * * * that I feel that she is a person who allows herself, number one to be victimized by inadequate overly-aggressive males, and that she cannot manage that part of herself well enough to protect herself. I think she's a victim, a chronic victim of these males and that her children necessarily get swept up into that path of harm over and over again. She does not seem to be able to stop that, she doesn't seem to be able to label it in her own mind and recognize it, and therefore I'm absolutely sure she can't prevent it * * *.
Dr. Fisher's report further stated that he was "concerned about the Keltners' sexuality." "He [Lloyd] seems to be a person whose immaturity and interpersonal anxiety could easily predispose him to seek safe, easily manipulated sexual partners such as children." Dr. Fisher's report concluded with the following statement:
 Unfortunately the Keltners are completely unsightful [sic] as to how psychologically toxic their attitudes, action, and beliefs are to their young children, and I am led to conclude that there is little or no hope of their ever changing significantly.
At the dispositional hearing, appellants presented evidence from their pediatrician, their landlord, and several relatives. All persons who testified on behalf of appellants stated that they had never witnessed Rachel or Lloyd physically or sexually abuse Tabitha or Austin.
Finally, Tabitha and Austin's guardian ad litem, who was present throughout the entire proceedings, and who had cross-examined most witnesses, submitted an oral report at the close of the dispositional hearing. There was no objection from appellants' counsel at the hearing to the guardian ad litem's failure to submit a written report. The guardian ad litem testified and recommended as follows:
 I think it's clear that these parents unfortunately are not in a position now or in the near future to take care of these two children, and that they are both adoptable, and I would respectfully request this court to grant the motion filed by Children Services.
In his brief, the guardian ad litem asserted that a written report was filed after the close of proceedings; specifically on August 29, 1997.
On August 29, 1997, the trial court granted permanent custody of Tabitha and Austin to BCCSB. On October 18, 1997, the trial court filed its "Amended Permanent Custody Entry." On July 14, 1998, the trial court issued its findings of fact. Specifically, the trial court found:
 That BCCSB offered the following services for Mr. and Mrs. Keltner in an effort to prevent the need for placement of these children outside the home: individual and group counseling at Catholic Social Services for both Mr. and Mrs Keltner; numerous psychological assessments by Dr. Charles Lee, Dr. Joseph Cresci, and Dr. Sherry Baker, and drug counseling at Drug Counseling Services.
 That both Mr. and Mrs. Keltner have histories of sexually abusing children and both have failed to successfully complete any treatment for sex offenders.
 That both Mr. and Mrs Keltner have histories of serious psychological problems which they have failed to overcome in therapy.
 That following placement of these children outside the home and efforts by BCCSB, Mr. and Mrs. Keltner have continuously and substantially failed to remedy the conditions which caused the children to be placed outside the home.
 That these children cannot be placed with either of the children's parents within a reasonable time and that the children should not be placed with either parent.
 That the children's continued residence or return to the home would be contrary to the children's best interests.
 That it is in the children's best interest to be permanently placed in the custody of BCCSB.
On September 29, 1997, appellants filed a notice of appeal. Appellants appeal the termination of their parental rights in three assignments of error.
In their first assignment of error appellants contend:
 APPELLANTS WERE PREJUDICED BY THE TRIAL COURT'S FAILURE TO DETERMINE THAT THE DEPENDENCY ADJUDICATION WAS VOLUNTARY AND KNOWING.
Specifically appellants argue that the trial court's dependency adjudication did not comply with the requirements of Juv.R. 29(D), and that such failure requires reversal and remand for new adjudication and disposition. However, due to certain jurisdictional defects, this court lacks jurisdiction over the trial court's finding of dependency, and therefore cannot sustain appellants' first assignment of error.
Appellants' assignment of error requires us to determine whether the trial court's November 15, 1996 "Adjudication and Dispositional Hearing Final Judgement Entry," constitutes a final appealable order. A final appealable order is "[a]n order which affects a substantial right" and is "perceived to be one which if not immediately appealable, would foreclose appropriate relief in the future." Bell v. Mt. Sinai Med. Ctr. (1993), 67 Ohio St.3d 60,63. The Ohio Supreme Court has specifically held that "an adjudication that a child is neglected or dependent, followed by a disposition awarding temporary custody to an public children services agency * * * constitutes `final order' * * *." In Re: Murray (1990) 52 Ohio St.3d 155, 161. With this knowledge in mind, we then look to App.R. 4 which provides:
 (A) Time for appeal. A party shall file notice of appeal * * * within thirty days of the later of entry of the judgment or order appealed * * *.
A review of the record reveals that the entry declaring Tabitha and Austin dependent children and awarding temporary custody to BCCSB was filed on November 15, 1996. Pursuant to App.R. 4(A), in order for appellants to have perfected a timely appeal, appellants needed to file their notice of appeal within thirty days of November 15, 1996. See In the Matter of Tara Caputo (Apr. 13, 1998), Butler App. No. CA97-02-032, unreported. The record reveals that appellants filed the notice of appeal on November 29, 1997; over ten months following the filing of the final judgment entry. Accordingly, this court is without jurisdiction to consider appellants' first assignment of error, and it is hereby overruled.
That being said, this court wishes to briefly address the trial court's procedure with respect to Juv.R. 29(D).[2]
Ohio courts have clearly held that Juv.R. 29(D) is analogous to Crim.R. 11(C), and therefore strict compliance with the rule is required. See In Re: Etter (June 12, 1998), Hamilton App. No. C-970510, unreported. Furthermore, Ohio case law dictates that pursuant to Juv.R. 29(D) a trial court must personally inquire of the person making an admission to ascertain the extent of voluntariness of the admission. Elmer v. Lucas Cty. Children Serv. Bd. (1987), 36 Ohio App.3d 241, 245.
In the case sub judice, the trial court did not address appellants personally to ascertain whether their stipulation of dependency was voluntarily made or whether they had a complete understanding of the consequences of entering such stipulation. In the future, we strongly urge the trial court to take the time to elicit such information from stipulating parties.
In their second assignment of error, appellants contend:
 APPELLANTS WERE PREJUDICED BY THE TRIAL COURT'S FAILURE TO ISSUE WRITTEN FINDINGS OF FACT SUMMARIZING THE SERVICES PROVIDED BY BCCSB, AND WHY THOSE SERVICES DID NOT PREVENT THE PERMANENT CUSTODY DETERMINATION, AS REQUIRED BY R.C. SECTION 2151.419(B).
R.C. 2151.419(B) provides:
 The court shall issue written findings of fact setting forth its determination under division (A) of this section. In its written finding of facts, the court shall briefly describe the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home.
Upon awarding permanent custody to BCCSB, the trial court made findings of fact and conclusions of law by including the following language in its October 8, 1997 "Amended Permanent Custody Entry:"
 [A]ll of the exhibits duly admitted shall constitute this court's findings of fact pursuant to Sec. 2151.419(B) O.R.C. Said exhibits are an accurate representation of the actions taken by BCCSB to prevent or eliminate the need for the ongoing removal of these children from the care of the parents.
Appellants argue that such incorporation does not comport with R.C. Section 2151.419(B). Upon through review of the record, this court determined that the trial court had before it all of the evidence necessary to issue written findings of fact as required by R.C. Section 2151.419(B). Consequently, this court sua sponte remanded this matter to the trial court for a period of thirty (30) days to allow the court to issue its written findings of fact. Such findings of fact were issued on July 14, 1998. This having been done, we find it is no longer necessary to address the issue raised in appellants' second assignment of error. Accordingly, appellants' assignment of error is rendered moot and hereby overruled.
In their final assignment of error, appellants contend:
 APPELLANTS WERE PREJUDICED BY THE GUARDIAN AD LITEM'S FAILURE TO ISSUE A WRITTEN REPORT, AS REQUIRED BY R.C. SECTION 2151.414(C).
R.C. Section 2151.414(C) provides:
 * * * A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing * * *.
* * * Appellants argue that because the record is "devoid of this written report," the dictates of R.C. Section 2151.414(C) have not been satisfied. Appellants further argue that such omission is grounds for a new permanent custody hearing.
Whether the guardian ad litem submitted a report or not is unclear from the record.[3] Nevertheless, we find appellants' failure to bring such error to the attention of the trial court at the dispositional hearing, at a time when the trial court would have had an opportunity to correct the omission, fatal to appellants' appeal. See In re: Tackett (Mar. 7, 1990), Adams App. No. CA496, unreported; In re Cordell (Apr. 2, 1992), Cuyahoga App. No. 60049 and 60050, unreported. "The general rule is that an appellate court will not consider any error which could have been, but was not, called to the attention of the trial court at a time when the error could have been avoided or corrected by the trial court." Tackett at 14, (citations omitted). Furthermore, "[a] trial court does not abuse its discretion in granting a motion for permanent custody where the guardian ad litem failed to issue a written report" and "no objection was offered at the hearing." Cordell at 8 (citations omitted; emphasis added). Accordingly, we find that any error resulting from the guardian ad litem's alleged failure to submit a written report was waived by appellants.
Recognizing that their failure to object is fatal to their claim, appellants urge this court to find that the guardian ad litem's failure to submit a written report rises to the level of plain error. We disagree. The standard for plain error is whether substantial rights were so adversely affected as to undermine the fairness of the legal process. See State v. Swanson (1984),16 Ohio App.3d 375. Plain error does not exist unless the outcome of the process would have been different but for the error. State v. Watson (1991), 61 Ohio St.3d 1, 6.
In light of the overwhelming evidence of dependency reflected in the record, this court finds that any error committed by the trial court with respect to the guardian ad litem's failure to file a written report worked no prejudice to appellants. This court is firmly convinced that any written report submitted by the guardian ad litem would not have changed the outcome of this legal process. The guardian's report would have no doubt been replete with evidence that only would have strengthened the trial court's determination that Tabitha and Austin's best interests were best served by awarding permanent custody to BCCSB. The evidence reveals that appellants are individuals with severe psychological problems who have refused to recognize that they are unable to properly parent their children, and have refused to or are unable to take the steps necessary to remedy such circumstances. Accordingly, appellants' third assignment of error is overruled.
Judgment affirmed.
KOEHLER and WALSH, JJ., concur.
[1] In 1997, Lyttle was adjudicated a "sexual predator" by the Butler County Court of Common Pleas. This court affirmed the trial court's determination of Lyttle as a sexual predator Ohio v. Lyttle (Dec. 22, 1997), Butler App. No. CA97-03-060, unreported.
[2] Juv.R. 29(D) mandates that a trial court:
 * * * shall not accept an admission without addressing the party personally and determining both of the following:
 (1) The party is making the admission voluntarily with the understanding of the nature of the allegations and the consequences of the admission;
 (2) The party understands that by entering an admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing.
[3] We note that at the dispositional hearing the guardian ad litem remarked: "Your Honor, I'd like to leave my report." However, the record does not contain a copy the report left with the court at the dispositional hearing. Nor does the record contain a copy of the report the guardian alleges he filed "after the proceedings" on August 29, 1997.