OPINION.
The defendant-appellant, Ronald Napier, appeals from his conviction for one count of rape, in violation of R.C.2907.02(A)(2), with a sexually-violent-predator specification pursuant to R.C. 2907.05(A)(1), and one count of gross sexual imposition, in violation of R.C. 2907.05(A)(1). Napier raises fifteen assignments of error in which he claims that double jeopardy prohibited him from being tried after the prosecution's error had earlier caused a mistrial; that the trial court erred in applying Ohio's rape-shield law; that the trial court erred in allowing evidence of a prior sexual act between him and the victim; that he was deprived of effective assistance of trial counsel; that his convictions were based upon insufficient evidence and were contrary to the manifest weight of the evidence; and that he was denied his statutory right to have the sexual-predator specification determined by the jury. Finding none of these arguments persuasive, we affirm.
 Evidence of Rape
Napier's conviction stems from allegations made by Tameika Howard, a fifteen-year-old girl. Napier was the boyfriend of Tameika's mother, Anna Howard, and was living with them in a two-bedroom apartment at the time. Tameika testified that on the night of June 2, 1998, Napier came into her bedroom while she was sleeping and started choking her. With his hands still around her neck, Tameika testified, Napier forced her to undress and lay down on the bed. According to Tameika, she was screaming and pounding on her bedroom wall as Napier continued to force himself upon her. Tameika testified that first he rubbed her vaginal area with his hand and then, while still holding her neck, put his penis in her vagina.
Tameika testified that, after Napier left her bedroom on the night in question, she remained awake crying until 6:00 a.m., and then fell asleep and awoke at 7:30 a.m. to the sound of her alarm. She testified that she then got out of bed, wiped herself off, and changed clothes. She stated that she told her mother, Howard, about the incident and that Howard did nothing. Tameika testified that she then proceeded to take the bus to school. At school, Tameika called her father, who took her to the police station. Officer Linda Day, the police specialist who met with Tameika and her father, testified that she noticed scratch marks on Tameika's neck that appeared to have been caused by fingernails and looked fairly new.
Tameika's father then took her to the hospital, where she was given a "rape-kit" examination. The examination produced no evidence of semen or blood. Pubic hair samples were all found to belong to Tameika. Officer Day testified that this was typical in rape cases like this one, where Tameika had wiped herself off, used the bathroom, and waited fifteen hours before the examination took place. Moreover, Tameika testified that Napier had not ejaculated inside of her that night.
Tameika moved out of the house after the incident. Napier continued to live with Howard. The Police Specialist testified that Howard was initially uncooperative with the investigation of her daughter's alleged rape. At trial, Howard admitted that she had a drinking problem and that, on the night of the alleged rape, she had been drinking in the apartment with her sister and eventually either passed out or fell asleep. She testified that she did not hear any screaming at all during the night. She testified that she told Officer Day and the contact person at 241-KIDS that the rape never occurred because Napier always maintained his innocence to her.
On August 27, 1998, Napier was indicted and charged with one count of rape and one count of gross sexual imposition. Officer Day, who attempted to interview him, testified that Napier refused to sign a waiver of his Miranda rights. However, Officer Day testified that Napier stated without questioning that he was tired and upset about the situation. According to Officer Day, Napier then asked whether he was going to be charged with child endangerment. She testified that she informed him that she could not discuss the incident with him absent a signed waiver form. She testified, "And at that point his response was, well, I have only one thing to say about that; it wasn't rape." She stated that she then asked him if he wished to explain that statement. When he indicated that he did not, the interview was concluded.[1]
 Evidence of Prior Acts
At the rape-shield hearing, the prosecution presented, through the testimony of Tameika, evidence of two prior acts involving Napier and Tameika. In the first incident, Tameika alleged that sometime after Thanksgiving in 1997 Napier came into her bedroom while she was sleeping and touched her back and buttocks, causing her to awake with a start. She testified that Napier "asked me was I ready." According to Tameika, Napier left when she threatened to scream, but then came back only minutes later and touched her again in the same place. She stated, "I jumped up, I said, man, if you don't get out I'm going to scream for real. So he left. He ain't come back in."
Tameika testified that she did not tell her mother of the incident the next morning. However, she stated that, two weeks later, Howard asked her whether Napier had come into her room. According to Tameika, she then told Howard what had happened. She stated that Howard responded by telling her that Napier was "testing" her. Tameika testified, "I told my mama I do not need to be tested from nobody."
In the second incident, Tameika testified that sometime between Christmas and New Year in 1997 Napier came into her bedroom at night while she was asleep with a butcher knife. She stated that she awoke and tried to get out of bed but couldn't because Napier "was right there in front of me with the knife."
According to Tameika, Napier then left her bedroom. She stated that she waited five minutes and then went into Howard's bedroom, where Napier was also sleeping, to tell her that Napier had "tried to kill me with a knife." According to Tameika, Napier started laughing. Tameika stated that Howard at first tried to get Napier to leave for the night but that Napier "talked my mama into staying."
Following the rape-shield hearing, the trial court ruled that evidence of the second incident would not be permitted because it was not "a sexual thing" and therefore there was no basis for its admission under Evid.R. 404(B). However, the trial court ruled admissible evidence of the first incident.
Assignments of Error Concerning the Trial
1. Mistrial and Double Jeopardy
In his first assignment of error, Napier asserts that the prosecutor "goaded" him into successfully requesting an earlier mistrial, and therefore the Double Jeopardy Clauses of the Ohio and U.S. Constitution prevented a subsequent trial on the charges. We disagree.
The earlier mistrial occurred when the prosecutor called Tameika as its first witness and solicited from her testimony regarding the first prior-act incident without requesting a rape-shield hearing under R.C. 2907.02(E). Defense counsel immediately objected under Evid.R. 404(A)(1) and moved for a mistrial. The objection was sustained and the motion granted.
"Whether prosecutorial misconduct causing a mistrial after jeopardy has attached precludes a retrial of the defendant depends upon review of the prosecutor's actions to determine if they were a deliberate attempt to goad defendant into moving for a mistrial." State v. Fields (1994), 97 Ohio App.3d 337,646 N.E.2d 866, overruled on other grounds by State v. Rance (1999),85 Ohio St.3d 632, 710 N.E.2d 699. See, also, State v. Best (1975), 42 Ohio St.2d 530,330 N.E.2d 421; Oregon v. Kennedy (1982),456 U.S. 667, 102 S.Ct. 2083; State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343.
Napier's argument that the prosecutor's admitted mistake was a deliberate attempt to nullify the first trial is unconvincing and unsupported by the record. The prosecutor, who apologized profusely and took full responsibility for her mistake, explained to the trial court that she believed in good faith that the evidence was admissible without a hearing under Evid.R. 404(B). The record further shows that Napier's counsel conceded that the prosecutor's mistake was unintentional. Napier's counsel stated, "I don't take issue with what [the prosecutor] said as to her motives and intentions, but the reality is, my client had no option other than ask for a mistrial."
Given the fact that the mistake occurred just as the trial began, with the prosecution's first witness, it is difficult to conceive why the prosecution would want to deliberately sabotage the trial just as it had gotten underway. Certainly we cannot say that the record supports an ulterior motive for the prosecutor's mistake. Napier's first assignment of error is overruled.
2. The Rape-Shield Hearing
In his second and third assignments of error, Napier argues that that he was denied a fair trial and due process when the trial court held the rape-shield hearing less than three days before the second trial, and then would not grant him a continuance of at least three days afterward. The rape-shield statutes state that "the court shall resolve the admissibility of the proposed evidence in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during trial." R.C. 2907.02(E) and 2905.02(E) (applying to rape and gross sexual imposition, respectively).
The rape-shield hearing was conducted the day after the trial court declared a mistrial. The hearing was held in chambers. Before the hearing, defense counsel argued that the state had, in essence, waived its right to a hearing (and, consequently, its right to present evidence of other acts) because the hearing had not been requested at least three days prior to the earlier mistrial. Defense counsel stated, "This [case] was continued twice by the State, and my client has been locked up the entire time. We don't see at this late hour why the issue should even be before the Court, so we're going to object." The trial court overruled the motion, stating specifically that it found "good cause" to hold the hearing.
After the hearing was conducted, and the trial court ruled admissible evidence of the first incident testified to by Tameika, defense counsel then moved for a three-day continuance "so that we can revise our thinking, review our strategy, and properly prepare [a] defense for trial." The trial court denied the motion for the reason that defense counsel had earlier raised in arguing against the hearing — that any delay would prolong Napier's pre-trial detention. The prospective jurors were then brought in and voirdire begun. The trial commenced that afternoon.
According to the Ohio Supreme Court, the major purpose of the hearing provision of the rape-shield law is to insure a pre-trial in camera hearing before presentation of any evidence of sexual activity takes place. See State v. Acre (1983), 6 Ohio St.3d 140,451 N.E.2d 802. "The basic requirement of the section is that prior to presentation of evidence there must be a hearing within chambers of the court, not a mere discussion at the bench." Id. at 143, 451 N.E.2d at 805. In the case at bar, there is no question that the trial court judge met this requirement by holding an in camera hearing of the evidence before the second trial got underway.
Napier raises no procedural error about the hearing itself; rather, he argues that the trial court's decision to hold the hearing and then not delay the beginning of the second trial for three days constitutes reversible error. In Napier's view, the purpose of the three-days-before-trial provision is to give the defense adequate notice to prepare and defend against the other-acts evidence. Further, Napier argues that because the second trial had yet to commence, this was not a situation that occurred "during trial" and therefore the "good-cause" exception to the three-days-before-trial requirement did not apply.
We have found no case law discussing the purpose of the three-days-before-trial requirement in either R.C. 2907.02(E) or 2907.05(D). Even if it is assumed for argument's sake to have the purpose Napier suggests, it is clear that the three-days-before-trial requirement was not intended by the legislature to be absolute, since the statute contemplates that for "good cause shown" the hearing may be held even during trial. Although technically the hearing here was not conducted during trial, we find the unusual circumstances in which it did occur after a mistrial had been declared so early in the first trial — to be sufficiently analogous to a situation during trial. Further, we cannot say that the trial court's reason for denying Napier a three-day continuance did not constitute good cause, particularly since defense counsel was the first to express to the trial court a concern for the length of Napier's pre-trial detention.
Nor, it should be pointed out, is there any basis in the record to conclude that the lack of a three-day continuance contributed to the defendant's conviction. See State v. Cotton (June 26, 1996), Hamilton App. No. C-950288, unreported. The in camera hearing made Napier aware of the testimony that the prosecution would bring out in trial, and afforded him an excellent (and otherwise unavailable) opportunity to explore its strength and weakness by cross-examining its only source, Tameika, outside the presence of the jury. Although Napier argues that he was prejudiced because he then did not have an additional three days to prepare his defense, he has not proffered any evidence or argument how an additional three days would have altered his strategy or defense. We cannot say, therefore, that any error would have been prejudicial.
Accordingly, Napier's second and third assignments of error are overruled.
3. The Admissibility of the First Incident
In his fourth assignment of error, Napier argues that Tameika's testimony concerning the alleged prior incident in which he came into her bedroom and fondled her back and buttocks, asking her if she was "ready," violated Evid.R. 404(B). Although we concede that this issue is close, we find that the trial court did not abuse its discretion by admitting the testimony.
"The admissibility of other-acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crimes charged in the indictment." State v. Cotton, supra, citing State v. Schaim (1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 668. This is particularly true with respect to sexual offenses where the jury can be easily swayed by evidence of prior acts demonstrating certain sexual proclivities or immoral behavior. Consequently, the legislature has imposed additional restrictions of other-acts evidence in prosecutions for sexual offenses. See R.C. 2907.05(D) and 2907.02(D).
Because the incident involved Napier's past sexual activity with the victim, it was admissible under these code sections, but only to the extent that the trial court found (1) that the testimony was material to a fact at issue in the case, and (2) that the inflammatory or prejudicial nature of the testimony did not outweigh its probative value. Id. Additionally, Evid.R. 404(B) expressly provides that defendant's other crimes or acts are inadmissible to prove his character and to show that he acted in conformity therewith. However, the same rule allows such evidence when it is necessary to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See, also, R.C. 2945.69 (parallel statutory provision of Evid.R. 404[B]).
In the present case, Napier's motive for the alleged rape was not at issue. If Napier did rape Tameika, he was guilty regardless of his reasons. Nor was his opportunity to commit the rape in dispute, since he was living in the same house as Tameika and Howard. Similarly, there was no suggestion that the alleged rape was a mistake or accident. Finally, merely because a defendant pleads "not guilty" does not place his or her identity at issue. In the instant case, Tameika clearly identified the rapist as Napier, a person well known to her — the only question was whether a rape actually occurred, not the identity of the rapist.
However, we hold that the record did contain some evidence upon which the trial court could have properly concluded that Napier's intent was at issue. This evidence consists of the statement Napier allegedly made to Officer Day when she attempted to interview him. According to Officer Day, rather than saying that he had not raped Tameika, Napier told her that "it wasn't rape." These words could have been construed by the jury as an admission that something of a sexual nature had occurred between Tameika and Napier, but that whatever did occur was not coerced. As noted, the statement was not objected to by defense counsel. As Napier did not present any evidence in defense, these three words assume special significance as the only evidence the jury had of Napier's refutation of the charges against him.
We hold that these three words — "it wasn't rape" — were sufficient to raise an issue of Napier's intent with respect to any sexual contact he had with Tameika. Consequently, we hold that Evid.R. 404(B) allowed the prosecution to present evidence that would refute any intimation that Tameika had consented to sexual conduct with Napier. The prior incident in question constitutes such evidence since it involved an episode in which, if the jury believed Tameika, Napier made an uninvited sexual advance toward her.
Further, we hold that the testimony of the first incident could also be admissible to demonstrate Napier's plan or preparation for the alleged rape. It must be emphasized that not every similar prior act is probative of a plan or preparation to commit the charged offense. If this were true, the exception would indeed swallow the rule. However, in the present case, Tameika testified that Napier asked her "if she was ready" after he touched her back and buttocks, suggesting that perhaps the first incident was part of his preparation or plan for the later rape, which also involved an uninvited late night entry into her bedroom. (The prosecutor argued forcefully in closing argument that the incident was, in fact, a test by which Napier sought to find out how Tameika and Howard would respond to his sexual predations.)
Having held that the incident meets the threshold requirement of admissibility that it address a fact or facts at issue, we still must consider whether the trial court erred in determining that the inflammatory or prejudicial nature of Tameika's testimony concerning the incident did not outweigh its probative value. R.C. 2907.05(D) and 2907.02(D). It is well settled that an appellate court may not disturb a trial court's evidentiary determinations under R.C. 2907.05(D), 2907.02(D) or 2954.59 or under Evid.R. 404(B) unless it can be said that the trial court's decision was an abuse of discretion amounting to prejudicial error. See State v. Lowe (1994), 69 Ohio St.3d 527,634 N.E.2d 616; State v. Graham (1979), 58 Ohio St.2d 350, 390 N.E.2d 805; Cotton, supra; State v. Brown (Oct. 25, 1995), Hamilton App. No. C-940771, unreported; State v. Mills (Dec. 12, 1990), Hamilton App. No. C-880581, unreported, affirmed in State v. Mills (1992),62 Ohio St.3d 357, 582 N.E.2d 972; State v. Leslie (1984),14 Ohio App.3d 343, 471 N.E.2d 503.
In order to constitute an abuse of discretion, the trial court's determination must be more than a matter of fair debate; rather, it must demonstrate an unreasonable, arbitrary, or unconscionable attitude. Cotton, supra, citing State v. Adams (1980), 62 Ohio St.2d 151,157, 404 N.E.2d 144, 149. Here, the evidence against Napier was not overwhelming, consisting largely of Tameika's own testimony. There was no strong corroborating physical evidence of rape. However, the prior incident in question was not apparently violent, nor was it of such an inflammatory nature that the jury would necessarily have been moved to punish Napier regardless of whether he committed the rape. Evidence of the prior incident did not alter the central question that the jury had to ask itself whether Tameika was a credible witness.
We cannot say, therefore, that the trial court's decision to admit the testimony of the first prior incident was arbitrary, unreasonable, or capricious. As an appeals court, we cannot substitute our judgment for that of the trial court in such matters. Napier's fourth assignment of error is, therefore, overruled.
4. Mistaken Reference to the Second Incident
At trial, the prosecution elicited testimony from Tameika concerning the first incident but not the second. However, during Howard's testimony she mistakenly assumed that the prosecution was asking about the second incident. In response to a question about what steps she took after Tameika told her about the rape, Howard responded, "Well, I asked him, but he denied that he had a knife. I asked him about that, did he have — put the knife if he have a knife to her throat." The prosecution quickly added, "No, we're talking about, ma'am, this morning, your daughter is crying, she told you something happened. This is June 2nd, okay? Are you with me?"
There was no more testimony, inadvertent or otherwise, concerning the second incident. Defense counsel did not object to the mistaken reference to the second incident by Howard. Neither the prosecution nor the defense referred to the second incident during closing argument. However, during its deliberations, the jury came back into the courtroom and submitted two written questions to the trial court. The second question was: "Tameika's mother mentioned an incident with a knife. Then the prosecutor said we were talking about the rape. What incident was that?"
After noting that it had conferred with counsel, the trial court responded to the questions by instructing the jurors: "All the evidence that you are entitled to have has been presented to you. Your decisions must be based upon the evidence presented to you in court. You, the jury, are the sole judges of the facts." The trial court then sent the jurors back out after directing them to continue with their deliberations. Immediately after the jury left, the trial court asked both the prosecutor and defense counsel if they had "[a]nything for record." Both replied that they did not.
In his fifth assignment of error, Napier argues that it was "plain error" for the trial court not to have sua sponte instructed the jury that it could not consider Howard's mistaken reference to the second incident. Napier must rely upon the "plain-error" doctrine since such an instruction was never requested by his trial attorney, either as a curative measure at the time of the mistaken reference or before the jury deliberated. Crim.R. 52(B); State v. Williford (1990), 49 Ohio St.3d 247, 551 N.E.2d 1279; State v. Underwood (1983), 3 Ohio St.3d 12, 444 N.E.2d 1279; see, also, Crim.R. 30(A).
In order for error to be considered "plain error," it must affect the defendant's substantial rights. Crim.R.52(B). Because most errors that are not objected to during trial are deemed waived upon the principle that if raised they could have been cured, the "plain-error" doctrine is "to be applied with the utmost caution and invoked only under exceptional circumstances to prevent a miscarriage of justice." State v. Cooperrider (1983), 4 Ohio St.3d 226,227, 448 N.E.2d 452, 453. To this end, the doctrine is properly invoked only when it is apparent that error was committed and that the error changed the outcome of the trial. State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804.
We cannot say that it was even error for the trial court not to have given a curative or limiting instruction when the mistaken reference was made. Defense counsel may have deliberately avoided objecting or asking for such an instruction to avoid drawing any further attention to the testimony. For the trial court to act unilaterally may well have sabotaged this strategy.
As for the trial court's response to the written jury question asking about the reference, the trial court expressly stated that it had conferred with counsel off the record before giving the general instruction that it did. Defense counsel did not object afterward. It is possible, therefore, that defense counsel for strategic reasons may have requested the general instruction or at least expressly concurred with the trial court's decision to give it in favor of any other instruction. Under these circumstances, we simply cannot say that the trial court committed error.
5. Ineffective Assistance of Counsel
In his sixth assignment of error, Napier argues that his defense counsel was ineffective for failing to request a limiting instruction with respect to Tameika's testimony about the first prior incident, which was admissible, and for failing to request a curative instruction with respect to Howard's mistaken reference to the second prior incident, which was not admissible.
As we have stated, it is distinctly possible that defense counsel may have adopted a deliberate strategy of ignoring testimony of both incidents in an attempt to minimize its impact upon the jury. Given the possibility that defense counsel's forbearance was a legitimate trial tactic, it is impossible to say that his performance fell below an objective standard of reasonableness. See Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052. When reviewing the actions of trial counsel, appellate courts are constrained to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. at 2065. Given this presumption, and the possible tactical justification for defense counsel's quiescence, Napier's sixth assignment of error is overruled.
6. Merger of the Two Counts for Purposes of Sentencing
In his seventh assignment of error, Napier argues that the trial court erred by failing to merge the rape and gross-sexual-imposition counts because they are allied offenses of similar import under R.C. 2941.25.
In State v. Rance, supra, the Ohio Supreme Court recently made clear that a strict comparison-of-the-statutory-elements test is now to be used in determining whether offenses are allied and of similar import. As we observed in State v. Norman (Dec. 3, 1999), Hamilton App. Nos. C-980874 and C-980872, unreported, "[t]his test consists solely of a textual analysis of the statutory provisions to determine whether the elements of the charged offense `correspond to such a degree that the commission of one crime will result in the commission of the other.'" Norman, supra, quoting Rance, supra, at 638, 710 N.E.2d at 704. The test is to be performed in the abstract, without regard to the facts of the particular case. If the two offenses each contain a separate element, "the offenses are of dissimilar import and the court's inquiry ends — the multiple convictions are permitted." Rance, supra, at 636,710 N.E.2d at 699. In sum, the Ohio Supreme Court has determined that the General Assembly may prescribe cumulative punishments for certain offenses without violating Double Jeopardy.
Napier was convicted of rape under R.C. 2907(A)(2). The elements of the offense require that a person engage in "sexual conduct" with another "when the offender purposely compels the other person to submit by force or threat of force." He was also convicted of gross sexual imposition under R.C.2907.05(A)(1). The elements of this offense require that a person engage in "sexual contact" with another when "the offender purposely compels the other person * * * to submit by force or threat of force." As can be seen, ostensibly the two offenses each contain a different element, "sexual conduct" and "sexual contact." However, as these terms are statutorily defined in R.C.2907.01(A) and 2907.01(B), respectively, it is clear, using a purely textual analysis, that it would be impossible to engage in "sexual conduct" without engaging in "sexual contact." The former is merely a more egregious form of the latter.
We hold, therefore, that the two offenses correspond to such a degree that the commission of rape necessarily results in gross sexual imposition. The Rance test is, therefore, satisfied. The only question remaining is whether the two offenses were part of one uninterrupted episode, as Napier maintains, or whether they were two acts separated by a different animus, as the state maintains.
Tameika testified that after Napier came into her room the night of the alleged rape, he grabbed her throat and told her to remove her undergarments and lay down on the bed. She stated that, while still holding her throat, Napier leaned over her and "rubbed around my vagina." Then, she testified, she started crying and Napier proceeded to rape her.
As the state correctly points out, two different acts do not need to be spatially or temporally distinct to be carried out with a separate animus. State v. Barnes (1981), 68 Ohio St.2d 13, 427 N.E.2d 517. However, the state's argument that the instant case is similar to Barnes is not entirely persuasive. In Barnes, the Ohio Supreme Court held that the defendant committed two separate and distinct offenses by engaging in fellatio followed immediately by vaginal intercourse. As observed by Justice Celebrezze, Barnes involved "different, multiple sexually assaultive acts * * * which resulted in two chargeable rape offenses." Id. at 15, 427 N.E.2d at 519 (Celebrezze, J., concurring). "Each act was a separate and distinct offense. Each act violated a different area of the victim's body. Each act subjected the victim to a different kind of injury, pain, danger, fear, and humiliation." Id. The state also relies upon this court's decision in State v. Jackson (Feb. 15, 1984), Hamilton App. Nos. C-830331, C-830343, unreported, in which we held without discussion that the defendant acted with a separate animus when he raped a child after first applying an electric vibrator to her genital area.
Napier, on the other hand, relies upon a line of cases from the Cuyahoga Court of Appeals which analyze the issue in terms of whether there were "multiple, independent acts of forcible activity" or "one uninterrupted assaultive episode." State v. Davis (Sept. 24, 1981), Cuyahoga App. No. 42610, unreported, quoted in State v. Abi-Sarkhis (1988), 41 Ohio App.3d 333,337, 535 N.E.2d 745, 749. In Abi-Sarkhis, the court held that defendant's fondling of the victim immediately prior to the act of fellatio was "incidental to the act of fellatio which constituted the offense of rape and that there were no separate animuses to said conduct." Id. Similarly, in State v. Nash (Sept. 25, 1980), Cuyahoga App. No. 41450, unreported, the same court held that the defendant could not be convicted of two counts of gross sexual imposition in addition to rape where he had committed two subsequent acts of fondling during one continuous assault lasting fifteen minutes.
The determination of whether the defendant acted with a separate animus in committing two separate offenses is, in our view, largely a matter of what is, or is not, contained in the record. Here, there is no evidence of how long a time Napier rubbed around Tameika's vagina before raping her — whether it was less than a minute, five minutes, or ten minutes. There is, furthermore, no evidence to show whether the rubbing was originally intended as its own source of gratification, from which the intent to rape was then formed, or whether the rubbing was merely incidental to the rape. Tameika testified that the rubbing occurred as Napier was leaning over her, suggesting that it was not part of any act of physically subduing her. Her testimony that she began to cry as a result of the rubbing also indicates that the rubbing was its own injury and its own source of "danger, fear, and humiliation." The rape, however, did not involve more than one bodily orifice and appears to have been one uninterrupted episode.
Upon review of the record, we simply cannot say that Napier has demonstrated that the vaginal rubbing and the rape were committed with the same animus. For us to hold that the rubbing was merely incidental to the rape would require us to speculate as to length and nature of the rubbing and what was going through Napier's mind at the time. The record is absolutely silent on these matters. His seventh assignment of error is, therefore, overruled.
8. Sufficiency of the Evidence
In his eighth assignment of error, Napier asserts that the trial court erred by denying his Crim.R. 29 motion for acquittal on the gross-sexual-imposition count because of the lack of corroboration. Specifically, he argues that because sexual imposition requires corroboration to sustain a conviction, see R.C. 2907.06(B), so should the more serious crime of gross sexual imposition. This is particularly true, he argues, because sexual imposition is a lesser-included offense of gross sexual imposition.
R.C. 2907.06(B) specifically states that no person shall be convicted of sexual imposition "solely upon the victim's testimony unsupported by other evidence." By omitting this language from the statute proscribing gross sexual imposition, R.C. 2907.05, it must be assumed that the legislature had a reason. For this court to, in effect, amend R.C. 2907.05 by engrafting upon it a version of R.C. 2907.06(B) would be a usurpation of the legislative function. See State v. Merriweather (1980), 64 Ohio St.2d 57, 59, 413 N.E.2d 700, 701. Furthermore, we note that Tameika's testimony was not entirely without corroboration in this case given Officer Day's testimony that she observed scratches on Tameika's neck which appeared to have been recently made with fingernails. Simply because the defense offered another explanation for these scratch marks did not mean that the jury had to accept that explanation, or could not consider them as corroborative of Tameika's testimony.
Napier's eighth assignment of error is overruled.
9. Weight of the Evidence
In his ninth assignment of error, Napier argues that his convictions were contrary to the weight of the evidence. According to Napier, Tameika's testimony was "simply incredible." His argument is based upon the fact that Howard testified that she did not hear Tameika's screams; that Tameika "admitted" to being in a fight that may have caused "the scars" on her neck; that Tameika was biased and prejudiced because she testified that she had never liked Napier; that Tameika's testimony was self-serving because she testified that she wanted to move back with her natural father and was able to do so after the alleged rape; and that all medical and scientific tests "proved [his] innocence."
The role of a reviewing court in considering a challenge to the weight of the evidence was set forth in State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 546-547:
When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs [v. Florida (1982)], 457 U.S. [31,] 42, 102 S.Ct. [2211,] 2218 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172,175, * * * 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.")
It is well settled, furthermore, that the jury, being able to view the witnesses and observe their demeanor in response to questioning and cross-examination, is uniquely situated to gauge matters of credibility. State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
Reviewing the record, we reject Napier's contention that Tameika's testimony was incredible. Concededly, Howard testified that she did not hear Tameika's screams, but the jury could have reasonably concluded that this was due to the fact that she had passed out from drinking. Alternatively, the jury could have simply decided that Howard was lying out of a sense of shame for her doing nothing in response. As for Tameika's scratch marks, it is true that the defense attempted to attribute these to another incident, but the jury was in no way obligated to accept the defense theory of an alternative cause. Concerning the lack of corroborating physical evidence, Officer Day testified that this was typical in a case where the victim had wiped herself off, used the bathroom, and waited fifteen hours before the examination. The lack of corroborating physical evidence cannot be said to prove Napier's innocence. Finally, just because Tameika was candid enough to admit her dislike for Napier does not mean everything she said about his behavior toward her was a lie.
Reviewing the evidence of record, we find no basis, even sitting as a "thirteenth juror," to disagree with the jury's resolution of the facts in this case. Certainly we cannot say that this is the "exceptional case in which the evidence weighs heavily against the conviction."
Napier's ninth assignment of error is overruled.
10. Admissibility of Photographic Evidence
In his tenth assignment of error, Napier argues that the trial court erred by admitting photographs of Tameika's scars and scratches. The basis of his argument is that although Officer Day first testified that the photographs accurately depicted the wounds on the date of the offense, she later testified that the photographs did not actually represent how the wounds appeared to the naked eye.
As the state points out, when Officer Day later testified that the photographs were not entirely representative, she explained this to mean that they did not capture the full extent of the injuries because the scratches were actually more prominent than they appeared on film. We agree with the state that this testimony "no way impugns the relevancy, accuracy, authentication, or competency of this photographic evidence." Rather than being prejudiced by the photographs, it would seem that Napier would have benefited from their failure to fully depict the prominence of the injuries. In any case, we cannot say that the trial court abused its discretion by admitting the photographs into evidence. See State v. Watson (1991), 61 Ohio St.3d 1,7, 572 N.E.2d 97, 104.
11. Prosecutorial Misconduct
In his eleventh assignment of error, Napier argues that the actions of the prosecutor during closing argument constituted prosecutorial misconduct that deprived him of a fair trial. Although defense counsel did not object to any of the alleged instances of misconduct, Napier argues that the trial court was obligated to take measures to cure their prejudicial effect because the misconduct was "gross" and "abusive."
Napier argues initially that the prosecutor engaged in "improper, gross, and abusive conduct" by attacking his character. He points to the following passage in the state's closing argument, in which the prosecutor, after discussing evidence of the first incident, addressed Napier's alleged explanation that he was just "testing" Tameika to prepare her for the unwanted advances of other males.
He's strange. He's sick. He's demented and perverted. First of all, if you even believe his explanation that this is just a test, he's her mom's boyfriend. Who is he? He's not Tameika's father. And even if he was, who does that? You don't teach someone a lesson by sneaking into their bedroom and groping them.
Second, Napier argues that the prosecutor engaged in misconduct when, in trying to convince the jury that Tameika had no motive to lie, she argued, "Look at this through her eyes, the eyes of a child, on what she could do. What her choices were in this case. Use your common sense and you'll find that the defendant is guilty. Judge all the evidence that you've heard. Tameika alone is good enough."
It is a commonplace that prosecutors are given "wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Stephens (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773, 777. Nothing in the prosecutor's remarks invited the jury to reach its decision on matters outside the evidence (in fact, the prosecutor in the second quoted passage told the jury to judge all the evidence). Similarly, the prosecutor did not denigrate defense counsel, express her personal opinion about Napier's guilt, expressly appeal to the jury's emotions, note Napier's failure to take the stand, or knowingly make a false statement of law or fact. Her language describing Napier was perhaps unnecessarily harsh, but the prosecutor is allowed to strike hard blows. Berger v. United States (1935), 295 U.S. 78, 55 S.Ct. 629; State v. Lott (1990),51 Ohio St.3d 160, 166, 555 N.E.2d 293, 300.
In sum, we do not consider the excerpted remarks gross or abusive. As noted, defense counsel did not object to them at the time that they were made. As stated by the Ohio Supreme Court:
Except where counsel, in his opening statement and closing argument to the jury, grossly and persistently abuses his privilege, the trial court is not required to intervene sua sponte to admonish counsel and take curative action to nullify the prejudicial effect of counsel's conduct. Ordinarily, in order to support a reversal of a judgment on the ground of misconduct of counsel in his opening statement and closing argument to the jury, it is necessary that a proper and timely objection be made to the claimed improper remarks so that the court may take proper action thereon.
Snyder v. Stanford (1968), 15 Ohio St.2d 31, 238 N.E.2d 563, paragraph one of the syllabus (emphasis in original). Even if we were to consider the remarks by the prosecutor to be out of bounds, they were but two isolated instances in the prosecutor's closing argument and were certainly not persistent in nature.
Napier's tenth assignment of error is overruled.
12. State's Exhibit #7
In his fifteenth assignment of error, Napier argues that the trial court erred by admitting into evidence the notification-of-rights form that he refused to sign when interviewed by Officer Day. According to Napier, State's Exhibit #7 violated a blanket constitutional prohibition against the use of a defendant's post-arrest silence.
The state remonstrates that the testimony at trial indicated that Napier "did not, at any point, invoke his right to remain silent" and that it was Officer Day who refused to have a conversation with him unless he signed the notification-of-rights form. In the state's view, admission of the form served the purpose of establishing that Napier "knew of his right to remain silent, and chose to speak to Officer Day anyway."
Significantly, as pointed out earlier, there was no objection to Officer Day's testimony concerning her interview of Napier. Thus the jury heard, without objection, Officer Day describe Napier's refusal to sign the form and his alleged subsequent statements. The significance of the form itself, whether viewed by the jury or not, pales in comparison to Officer Day's testimony. Therefore it is clear, without need to delve further, that any possible error with respect to the admission of this document was harmless.
Napier's fifteenth assignment of error is overruled.
 Verdict and Sentencing
Following the trial, in which Napier did not present any evidence in defense, the jury found Napier guilty of the rape and gross-sexual-imposition counts.
After the jury was discharged, defense counsel stated that it was his reading of the statute, R.C. 2971.02, that Napier was entitled to have the sexually-violent-predator specification determined by the jury, or, if he waived that right, by the trial court. Defense counsel then stated that he had "asked the Court before the jury was discharged, not to discharge the jury because I think the jury has to determine this unless my client is willing to waive the right and have you determine it."
The trial court responded by stating that it had discussed the matter previously in chambers with counsel, and that it had been the trial court's understanding that defense counsel did not wish to have the specification presented to the jury. The trial court then stated that it had therefore made no "provisions" for the matter being presented to the jury. The trial court stated that it would, therefore, determine the specification and "let the Court of Appeals decide what goes on."
Prior to the combined sentencing-and-specification hearing conducted days later, defense counsel stated again that "my client will not elect to be tried by the Court on this. He wants the jury to make this determination." Defense counsel also stated, "Prior to the verdict coming in, we asked the Court if it would hold the jury in event of a guilty verdict so that he could make that election and have the jury actually take part in the hearing." The trial court responded, "For the record, I recall being told by counsel, defense counsel, that the jury would not hear the specification. * * * There was never a request that I had heard or can recall, that the jury would make the specification. As a matter of fact, again I reiterate, I was told that the jury would not hear the specification. In no way was it ever indicated to me that the defendant wanted the jury to determine the specification."
The trial court then specifically ruled that Napier "did, in fact, elect to have the specification tried to the Court and not the jury."
Following the hearing, Napier was found by the trial court to be a violent sexual predator. He was sentenced to ten years on the rape count, five years on the sexually-violent-predator specification, and one year and six months on the gross-sexual-imposition count. The sentences for the rape and gross-sexual-imposition counts were made to run concurrently.
Assignments of Error Concerning Sentencing
1. Recusal
In his eleventh assignment of error, Napier argues that the trial court should have recused itself after demonstrating a predisposition against him. The assignment arises out of remarks made by the trial court after it ruled that Napier had elected to waive his right to have the jury determine the specification. The trial court stated, "With that, I will make a finding that the defendant is guilty of Specification One to Count 1. That he is, in fact, a sexually violent predator."
Napier's trial counsel hastened to point out to the trial court the necessity for a hearing before such determination was made. The trial court quickly admitted that it had gone "one step beyond" and "skipped a step" and would proceed with the hearing. At that point, defense counsel requested that the trial court recuse itself because it had obviously prejudged the issue.
Indisputably it was error for the trial court to find Napier to be a sexual predator before conducting a hearing. The question is whether the error, which the trial court promptly recognized and corrected, demonstrated the trial court's inability to fairly judge the issue. We hold that it did not.
Initially, it should be noted that this court has held that when the judge at a sexual-predator hearing presided over the original trial, he or she can properly take judicial notice of the prior proceedings. State v. Lance (Feb. 13, 1998), Hamilton App. Nos. C-970282, C-970283 and C-970301, unreported; State v. Owens (June 19, 1998), Hamilton App. No. C-970676, unreported. It was not as if, therefore, the trial court lacked any basis with which to judge Napier even before the hearing began. Furthermore, there is nothing in the record to indicate that once the trial judge admitted that he "skipped a step" that he did not fairly and impartially consider the evidence adduced at the hearing. Following the hearing, the trial judge extensively reviewed the statutory criteria and fully articulated a rationale for his findings. We hold that the record demonstrates no basis to conclude that the trial court's decision was swayed by bias or prejudice.
Napier's eleventh assignment of error is overruled.
2. Jury Waiver
In his thirteenth assignment of error, Napier argues that the trial court erred in denying his right to have the sexual-predator specification tried by the jury. In support of this assignment, Napier argues that the record is "absolutely devoid of any evidence [that Napier] knowingly, intelligently[,] and voluntarily waived his right to a jury trial."
We have already summarized the record on this issue. As noted, the trial court found expressly that Napier had elected to waive his right to a jury trial based upon conversations not on the record. Napier's success on this issue turns entirely, therefore, upon whether the election under R.C. 2971.02 must be in writing and of record.
Although not cited by either the state or Napier, in State v. Oldham (May 13, 1999), Cuyahoga App. No. 73644, unreported, the Eighth District Court of Appeals addressed directly the issue whether an election to have the sexually-violent-predator specification tried to the bench requires a signed jury waiver filed as part of the record. In Oldham, although there was no question that the defendant had sought to avoid having the jury determine the specification, the defendant nonetheless argued on appeal that the election was ineffective under R.C. 2945.05. R.C. 2945.05 provides that a jury trial waiver "shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof."
In rejecting this argument, the court in Oldham relied upon the Ohio Supreme Court's decision in State v. Nagel (1999),84 Ohio St.3d 280, 703 N.E.2d 773. In Nagel, the court held that R.C. 2945.05 did not apply to requests made under former R.C.2941.142 and 2941.143 to have the trial judge, in a case tried by a jury, determine guilt or innocence on prior-conviction specifications. The Supreme Court in Nagel reasoned as follows:
R.C. 2945.05, by its very terms, applies to pending "criminal cases." * * * Our understanding of the phrase is that it encompasses the underlying charge or charges in the criminal action against the accused but does not necessarily encompass the specification or specifications attached thereto. The reason, of course, is that a specification is, by its very nature, ancillary to, and completely dependent upon, the existence of the underlying criminal charge or charges to which the specification is attached. Therefore, we have difficulty understanding precisely how it is that R.C. 2945.05 could be found to apply in circumstances where, as here, a defendant has received a jury trial on the merits of the underlying charges alleged in the indictment.
Id. at 286, 703 N.E.2d at 778.
The Oldham court held that Nagel controlled the issue of election under R.C. 2971.03 rather than State v. Pless (1996),74 Ohio St.3d 333, 658 N.E.2d 766, requiring strict compliance with R.C. 2945.05. In so holding, the court in Oldham relied upon the following language in Nagel:
Pless mandates strict compliance with the requirements of R.C.2945.05, but does not mandate compliance with R.C. 2945.05 where that statute is clearly inapplicable. Here, R.C. 2945.05 had no applicability to appellee's request to have the trial judge determine the existence of the prior-conviction specifications and the criminal case against appellee was, in fact, tried by jury. Therefore, appellee's reliance on Pless is misplaced.
Id. at 287, 703 N.E.2d at 778.
Finally, the Oldham court rejected the defendant's argument that the sexual-predator specification was somehow different from the specification statutes considered in Nagel. The Oldham court reasoned that the goal of R.C. 2971.02 was the same as the statutes in Nagel — to guarantee that "a defendant is not prejudiced by prior conviction data."
We concur with the holding in Oldham that the election under R.C. 2971.02 does not require a signed written jury waiver filed as part of the record. Consequently we reject Napier's argument in this regard.
As for the trial court's finding that Napier had elected to have the specification tried to the bench, we note that the finding was based upon discussions off the record. We cannot say, therefore, that the finding was erroneous. Nor can we determine whether any off-the-record request to rescind the election was made before the jury was discharged. Although Napier insists that it was, the trial court stated that it could not recall any such request being made.
Finally, assuming that an election was earlier made, and that the request to rescind the election did not occur until after the jury was discharged, we cannot say that it was an abuse of discretion for the trial court to refuse to bring the jury back.
Napier's thirteenth assignment of error is overruled.
3. Fairness of the Hearing
In his fourteenth assignment of error, Napier argues that the trial court "did not preside over a full and fair hearing" to determine his status as a sexual offender. Again he argues that the trial court was predisposed to rule that he was a sexual predator based upon his finding to that effect made before the presentation of the evidence. He further argues that the evidence presented at the hearing did not militate in favor of a finding that he is likely to commit a sexually violent offense in the future.
We have previously discussed the lack of any support in the record that the trial court did not fairly and impartially consider the evidence once the specification hearing was held. Furthermore, we disagree with Napier that the evidence did not militate in favor of a finding that Napier is a sexually violent offender. The evidence at trial demonstrated a prior incident of coerced sexual contact with the victim. At the hearing it was revealed that Napier had, in addition, a prior conviction for two counts of gross sexual imposition, as well as a conviction for domestic violence. Although the trial court specifically stated that he did not consider the prior gross-sexual-imposition convictions to have been necessarily violent, the trial court stated that it did consider them to be sexually oriented offenses. Furthermore, the trial court emphasized the violent aspects of Napier's rape of Tameika, in which he held her by the neck, cut off her breath, and inflicted scratch marks. Further, under the statutory category of "other relevant evidence," the trial court stated that it considered the fact that Napier was in a position of trust with respect to Tameika as the live-in boyfriend of her mother. Also under this category, the trial court emphasized Napier's lack of demonstrable remorse.
Upon review of the record of the hearing, we find that there was a sufficient basis for the trial court to have concluded that Napier was a sexually violent offender.
 Conclusion
Based upon the foregoing, Napier's fifteen assignments of error are all overruled. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
SUNDERMANN and WINKLER, JJ., concur.
[1] Napier's alleged statements to Officer Day were not made the subject of a motion to suppress, nor did defense counsel object to them at trial.